590 F.2d 655
 1979 O.S.H.D. (CCH) P 23,299
 Jennifer BOGGS, Carol Combs, Geraldine Coots, Vera Galloway,
Libby Gibbs, Madonna Griffith, Diane McKnight, Geraldine
McKnight, Phyllis Peavy, Vickie Scott, Celinda Sparkman,
Ethel Sturgill, Debbie Turner, Reda Turner, and Charlotte
Widner, Administratices of their Decedents and Individually,
Plaintiffs-Appellants,
v.
BLUE DIAMOND COAL COMPANY, Defendant-Appellee.
 No. 77-1724.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 23, 1978.
Decided Jan. 23, 1979.
 
 Gerald M. Stern, George T. Frampton, Jr., Rogovin, Stern & Huge, Washington, D. C., Kelsey E. Friend, Pikeville, Ky., for plaintiffs-appellants.
 Eugene Goss, Harlan, Ky., for Galloway and Sparkman.
 James D. Asher, Whitisburg, Ky., for Sturgill.
 Bert T. Combs, Charles R. Simons, Tarrant, Combs & Bullitt, Robert I. Cusick, Jr., Louisville, Ky., Foster D. Arnett, Arnett, Draper & Hagood, Knoxville, Tenn., Richard C. Ward, Craft, Barrett, Haynes & Ward, Hazard, Ky., L. R. Coulling, Jr., Hudgins, Coulling, Brewster & Morhous, Bluefield, W. Va., Henry D. Stratton, Stratton, May & Hays, Pikeville, Ky., Maxwell P. Barret, Hazard, Ky., for defendant-appellee.
 Before MERRITT, Circuit Judge, and CECIL and PECK, Senior Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this diversity case, fifteen widows of coal miners killed in a mine disaster appeal the District Court's dismissal of their wrongful death action. The miners worked for a subsidiary corporation owned by the defendant, the parent corporation. Plaintiffs allege acts of negligence of the parent corporation separate and distinct from the conduct of the subsidiary. The case raises serious questions of first impression under Kentucky's Workmen's Compensation Act.
 
 
 2
 The Act, like other workmen's compensation laws, grants immunity from common law negligence to an "employer" covered by the Act and to "contractors" who provide certain types of services to an "employer." The immunity is given in exchange for the guaranteed insurance benefits payable to injured employees without regard to fault.[1] The principal issue is whether the parent is an "employer" or "contractor" immunized from tort liability under these provisions.
 
 
 3
 Finding an implied contract for the subsidiary to mine coal for the parent, the District Court concluded that the parent was a "contractor" exempt from tort liability under Kentucky's Workmen's Compensation Act. We hold that the parent should not be characterized as either a "contractor" or an "employer" under the Act. We reverse the District Court's judgment and remand the case for trial.
 
 I.
 
 4
 On March 9, 1976, fifteen coal miners were killed when methane gas exploded in Scotia Mine No. 1 at Oven Fork in Letcher County, Kentucky. The Scotia Mine is owned and operated by Scotia Coal Company, a wholly owned subsidiary of Blue Diamond Coal Company, whose offices and principal place of business are located in Knoxville.
 
 
 5
 Blue Diamond operates several coal mines and related businesses. It describes itself in its brief as a multi-unit enterprise consisting of a group of wholly owned subsidiary corporations controlled by a central holding company:
 
 
 6
 Blue Diamond enters into sales contracts based upon coal to be produced from the mines of its wholly owned subsidiaries. . . . All coal produced by Scotia is sold by Blue Diamond and shipped as directed by Blue Diamond. Sales are invoiced to customers by Blue Diamond and deposited in its bank accounts. A sale of coal from Scotia is entered as a credit to Scotia on the accounting records, But all money is retained by Blue Diamond and is used as it chooses. Funds needed to pay expenses at Scotia are furnished by Blue Diamond with an appropriate entry in the intercompany accounts. (Emphasis added.)The District Court found that within this corporate arrangement the management of Blue Diamond, the parent, had the primary responsibility for "mine safety functions" at the Scotia mine.
 
 
 7
 Simply stated, the theory of plaintiffs' case is this: Blue Diamond provided management, engineering and safety services to Scotia, including advice and assistance in mine ventilation. Blue Diamond's management recognized that improvements in the ventilation of the Scotia Mine were needed in order to minimize the accumulation of methane gas but negligently delayed construction of these improvements. Blue Diamond authorized removal of existing ventilation and safety devices in order to open a new tunnel of the mine but concealed the changes from federal mine inspectors who would have taken immediate steps to correct the dangerous condition or to close the mine had they known of the changes. The ventilation changes increased the methane gas in the existing tunnel and caused the explosion. Blue Diamond recklessly created a dangerous situation and put the miners' lives at risk in order to increase its profits in a rising market.
 
 
 8
 The parent corporation moved for summary judgment claiming immunity from tort under the Kentucky's Workmen's Compensation Act on the ground that the parent and subsidiary produce coal as part of an integrated business and should be considered a joint or single "employer." The parent argued, in the alternative, that the subsidiary produces coal for it under an agreement and that the parent should be considered a "contractor" expressly exempt from common law liability under the Act.[2]
 
 
 9
 At the close of plaintiff's case after three days of testimony before a jury, the parent moved for a directed verdict and also renewed its motion for summary judgment. The District Judge sustained its motion for summary judgment. He concluded that the "undisputed course of conduct" evidenced an implied contract "from 1962 to date" for the subsidiary to mine coal for the parent. The parent, he held, should be deemed a "contractor" exempt from common law liability. On this appeal we must decide the extent to which workmen's compensation laws abrogate the common law liabilities of a parent corporation or holding company for injuries to its subsidiary's employees.
 
 II.
 
 10
 Workmen's compensation laws were passed before the multi-unit enterprise became the norm in the American economy and before the accompanying managerial revolution in American business. See Chandler, The Visible Hand 377-498 (1977). For this reason, state workmen's compensation laws, including Kentucky's Workmen's Compensation Act, do not address the question of a parent corporation's immunity from common law tort liability for injuries to its subsidiary's employers, nor does the Kentucky case law interpreting the Act. Few cases from other jurisdictions touch upon the question, and the general legal literature in the field does not deal with it. In the absence of controlling authority, we look to the language of the Act, its history and purpose, and the general concepts underlying workmen's compensation laws in order to find a sound approach to the problem.
 
 
 11
 The dominant purpose of the movement to adopt workmen's compensation laws in the early decades of this century was Not to abrogate existing common law remedies for the protection of workmen. It was to provide social insurance to compensate victims of industrial accidents because it was widely believed that the limited rights of recovery available under the common law at the turn of the century were inadequate to protect them.
 
 
 12
 The so-called "unholy trinity" of judicially-created employer defenses, assumption of the risk, contributory negligence and the fellow servant rule, were developed and strictly enforced as legal rules in the last half of the nineteenth century. The result, according to Deans Prosser and Wade, was recovery in less than a quarter of work-related accidents, as injured workmen subsidized economic growth.[3]
 
 
 13
 Employers generally opposed the movement for "reform"; labor generally favored it. Workmen's compensation laws were adopted as a compromise between these contending forces. Workmen were willing to exchange a set of common-law remedies of dubious value for modest workmen's compensation benefits schedules designed to keep the injured workman and his family from destitution.
 
 
 14
 Since the adoption of workmen's compensation laws, common law tort principles have been modified gradually. Liability has expanded. The defenses of contributory negligence, assumption of the risk and the fellow servant rule have been narrowed or abolished. But workmen's compensation benefits have remained low, and the compromise which extended immunity from common-law liability to employers has remained in place.
 
 
 15
 Congress, responding to rising public consciousness of the need for occupational safety, has viewed the safety incentives provided by existing laws as inadequate. It has enacted new regulatory arrangements to insure more safety at mines[4] and at work places generally.[5]
 
 
 16
 Courts have responded by liberally construing the coverage provisions of workmen's compensation acts while narrowly construing the immunity provisions. Judge Celebrezze, writing for this Court, described the developments of Kentucky case law in this direction in Bryant v. Old Republic Insurance Co., 431 F.2d 1385 (6th Cir. 1970), a case which held that an employer's workmen's compensation insurance carrier is not an "employer" for purposes of the tort immunity provisions of the Act:
 
 
 17
 A review of the Kentucky constitution . . . reveals that the personal representatives of an estate have a constitutionally protected right to recover for wrongful death, "unless otherwise provided by law." Constitution of Kentucky § 241. The General Assembly of Kentucky subsequently codified this constitutional right . . . . The Workmen's Compensation Act is an express exception to Kentucky's constitutional and statutory right . . . .
 
 
 18
 (T)he Kentucky Court of Appeals seems to be narrowing the concept of employer's immunity under its workmen's compensation laws and In the absence of any compelling statutory language or social policy justification . . . we believe that Kentucky Courts will preserve that State's constitutional and statutory right . . . . (Emphasis added.)
 
 
 19
 431 F.2d at 1387-88.
 
 
 20
 Kentucky courts have given the "liberal" construction required by the express language of the Act by broadly construing the coverage provisions of the Act and narrowly construing the immunity provisions.[6]
 
 
 21
 Professor Arthur Larson, a leading authority in the field, justifies this approach for the following reasons:
 
 
 22
 (T)here is no strong reason of compensation policy for destroying common law rights . . . (and) Every presumption should be on the side of preserving those rights, once basic compensation protection has been assured . . . . The injured employee has a right to be made whole not just partly whole . . . . (A)ll the reasons for making the wrongdoer bear the costs of his wrongdoings still apply, including the moral rightness of this result as well as the salutary effect it tends to have as an incentive to careful conduct and safe work practices. (Emphasis added.)
 
 
 23
 2A Larson, The Law of Workmen's Compensation P 72.50 at 14-95 (1976).
 
 
 24
 In light of this history and policy, we agree that "every presumption should be on the side of preserving" common law rights in the absence of " compelling statutory language or social policy justification." We approach the problem from this perspective.
 
 III.
 
 25
 1. "Contractor " Immunity. The District Court concluded that the parent is a "contractor" for the mining services of its subsidiary and hence immune under the "contractor" provision of the Act. The Act provides that a "contractor" shall be deemed an "employer" under the Act. For purposes of this case, a "contractor" is one who (a) "contracts with another" (b) "to have (mining) work performed."[7] There is no question that the subsidiary performed mining work for the parent; the only question is whether the parent performed the work under a "contract" with the subsidiary.
 
 
 26
 In its brief on appeal, Blue Diamond argues first that there was an "implied contract" between the parties based upon their conduct; and second, even if there were no contract "in the technical sense" of "a formal, enforceable" agreement, the contractor provision requires only a "functional relationship by which one person" mines coal for another.
 
 
 27
 In the only case to date defining its scope, Kentucky's highest court read the "contractor" provision narrowly, even for the purpose of determining compensation coverage under the Act. It held that a mining company employee could not recover workmen's compensation from a separate company that had leased coal land to his employer. Elkhorn-Hazard Coal Land Corp. v. Taylor, 539 S.W.2d 101, 103 (Ky.1976). The court described the contractor provision as "limited in application," limited to "persons who Contract with another." Its legislative purpose was to "discourage owners and contractors from hiring financially irresponsible contractors and subcontractors" in order to avoid coverage under the Act.
 
 
 28
 This language, as well as the language of the statute itself, appears to contemplate a regular, enforceable contract between "independent" parties dealing with each other at arm's length. Here, there is no formal, integrated agreement, either written or oral. If we view the course of conduct of the parties as creating a "contract implied in fact" from the conduct of the parties, as did the District Court, it is unclear what the terms of the contract are, what mutual promises were made, what consideration was given, what the duration of the contract is, or what contractual obligations or expectations were created.
 
 
 29
 The principle of reciprocity or mutuality of obligation is the very essence of contract. Here it is missing. As Blue Diamond says in its brief, " all money is retained by Blue Diamond and is used as it chooses." Kentucky courts have declined to characterize and enforce such arrangements as " contracts" under Kentucky law, finding that they are so one-sided and unspecific as to be "illusory" and "lacking in mutuality." See Baber v. Lay,305 S.W.2d 912 (Ky.1957).
 
 
 30
 This does not end the matter, however. Blue Diamond stresses its second point that the Act does not require a specific contract "in the technical sense." It argues that the parent should be immune as a "contractor" if the realities of the situation create a "functional relationship" sufficiently like a contractual relationship to come within the purposes of the Act.
 
 
 31
 This argument does not strengthen Blue Diamond's position. Even if we were willing to stretch the point and dispense with the need for an actual contract, the relationship between the parties under such a reading of the contractor provision should at least fit within basic contract theory. Here it does not fit.
 
 
 32
 Contract theory either does not recognize, or characterizes as voidable, arrangements between parties who lack adequate bargaining power. Restatement of Contracts, Chaps. 1-2 (1933). A number of contract doctrines render ineffective arrangements where one party is subject to coercion or where there is no real exchange. For example, contract theory has not viewed the relationship between parent and child as contractual, and children and others without real bargaining power do not have the capacity to contract. The doctrines of duress, undue influence and unconscionability are based on similar considerations. Id. at Chaps. 15-18. The doctrine of consideration itself requires a real exchange between autonomous parties. Id. at §§ 6, 75-84. The doctrines of fraud and mistake presuppose a meeting of the minds between real parties with freedom to deal at arm's length. Id. at Chaps. 15, 17. Contract obligations are enforceable as a matter of "right," and contract theory is based on the intention of parties who possess the freedom to agree or disagree.[8]
 
 
 33
 These various contract doctrines suggest that the "functional relationship" between a parent and a subsidiary is not a contractual relationship. The expectations of the parties are not based on mutual promises, consideration or consent, for one party owns and has custody of the other party. The relationship between parent and subsidiary is based upon the status of the parties and is more like the relationship between parent and child, warden and prisoner, and other similar relationships. The relationship is not based upon the bargaining power of the parties.
 
 
 34
 We arrive at the same conclusion if we analyze the question in terms of the basic theory of corporation law. The business firm is a method, "alternative to contracting," of organizing economic production whereby performance is predicated upon the control inherent in share ownership rather than upon the terms of a contract. Posner, Economic Analysis of Law 174-89 (1973). The "essence" of the contract method is that "the entrepeneur negotiates . . . an agreement specifying the price, quantity, quality, due date, credit terms, etc., of the contractor's performance." In the corporate context, on the other hand, the parent "directs the performance" of the subordinate units. Id. at 174.
 
 
 35
 Consequently, we do not believe that the relationship here is contractual either in fact or in theory. The parent should not be characterized as a "contractor" for the mining services of its wholly owned subsidiary for purposes of the tort immunity provisions of the Act.
 
 
 36
 2. Employer's Immunity. Kentucky courts have not addressed the question of whether a multi-unit corporate enterprise should be viewed as a single "employer" for purposes of liability and benefits under the workmen's compensation statute. But Kentucky recognizes customary principles of corporation law which hold that separate corporate identities should not be disregarded. Square D. Co. v. Kentucky Bd. of Tax Appeals, 415 S.W.2d 594, 601 (1957). Owners may elect to divide their business into parent and subsidiary corporations entitled to respect as separate legal entities in the absence of improper purposes. To remove that right and the reciprocal obligations it imposes would violate general principles of Kentucky law. For example, in Poyner v. Lear Sielger, Inc., 542 F.2d 955 (6th Cir. 1976), the plaintiffs sought to hold a corporation liable for the obligations of its subsidiary. Applying "the law as it appears in existing Kentucky decisions," this court declined to disregard the corporate fiction, observing that "(t)he approach of the Kentucky Courts to piercing the corporate veil has been described as evincing 'a general aversion for any disregard of the corporate entity.' " Id. at 958. We noted "it would be an unprecedented extension of the Kentucky doctrine to disregard (the subsidiary's) separate corporate existence." Id. at 961.
 
 
 37
 Whatever the semantics, it is unusual to find the parent corporation arguing that the corporate "fiction" should be disregarded, or that the " corporate veil" should be "pierced." The separate artificial corporate personalities are usually disregarded only when the corporate device is used to defraud creditors, create a monopoly, circumvent a statute or for other similar reasons. Berle, The Theory of Enterprise Entity, 47 Colum.L.Rev. 343 (1947); Fuller, The Incorporated Individual, 51 Harv.L.Rev. 1373, 1401 (1938).
 
 
 38
 Under similar facts, other jurisdictions have declined to disregard the corporate entities at the request of the parent corporation. In Latham v. Technar, Inc., 390 F.Supp. 1031 (E.D.Tenn.1974), Judge Taylor held that the administrator of the estate of a deceased employee of a wholly owned subsidiary could sue the parent for its negligence in causing the death of the employee. The parent contended that plaintiff's sole remedy was workmen's compensation benefits. The court held, however, that the plaintiff could maintain a common law wrongful death action against the parent as a third party. Similarly, in Oliver v. St. Clair Metal Products Co., 45 Mich.App. 242, 206 N.E.2d 444 (1973), an injured employee sued the parent of his employer corporation as a third party claiming that negligence by the employees of the parent had caused his work-related injury. The court held that the suit could be maintained. Each of the parent's plants were separately incorporated as subsidiaries. The evidence showed that a management official of the parent corporation who was in charge of supervising production at various plants had become aware of the lack of safety features on a machine operated by plaintiff.[9]
 
 
 39
 These cases are based on the traditional view that a business enterprise has a range of choice in controlling its own corporate structure. But reciprocal obligations arise as a result of the choice it makes. The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee. See Fletcher, Fairness and Utility in Tort Theory, 85 Harv.L.Rev. 537 (1972).
 
 
 40
 The increasing concentration of discrete business entities in the hands of holding companies, regional, national and international, has a more subtle influence on the question raised in these cases. Implicit in these decisions is the suggestion that the tort system should not deny recovery in an increasingly concentrated economy to an injured employee due to the fortuitous circumstance that the tortfeasor is not a stranger but is controlled by the same business enterprise that controls his immediate employer. See Davis, Workmen's Compensation Using an Enterprise Theory of Employment to Determine Who is a Third Party Tort-Feasor, 32 Pitt.L.Rev. 289, 294 (1971).
 
 
 41
 We conclude that Blue Diamond should not be allowed to avoid the consequences of its corporate structure in order to claim immunity from customary tort liability under Kentucky's workmen's compensation statute. The District Court properly concluded "that Blue Diamond and Scotia are separate and distinct corporations" and properly rejected Blue Diamond's argument that the two corporations should be treated as one.[10]
 
 IV.
 
 42
 For these reasons, we conclude that under Kentucky's Workmen's Compensation Act a parent is not immune from tort liability to its subsidiary employees for its own, independent acts of negligence. The parent should be liable under customary principles of the common law for harm resulting from its own negligent or reckless conduct. See Restatement (Second) of Agency § 213 (1958).
 
 
 43
 This is not derivative liability. The parent is not liable under the doctrine of Respondeat superior for the negligence of the subsidiary. Id. at § 217. For purposes of the doctrine of Respondeat superior, a subsidiary which provides workmen's compensation should be treated as having terminated the derivative liability of its parent or principal by satisfaction of the claim. Id. at §§ 185, 217. But neither these rules of agency nor the workmen's compensation law insulate the parent from tort liability for its independent acts of negligence which cause injury to its subsidiary's employees.
 
 
 44
 Accordingly, the judgment of the District Court is reversed and the case is remanded for trial.
 
 
 45
 JOHN W. PECK, Senior Circuit Judge, dissenting.
 
 
 46
 Most respectfully, I feel required to dissent from the majority opinion in what is to me a particularly disturbing case.
 
 
 47
 As a point of departure, I am not in disagreement with the conclusion expressed in the majority opinion to the effect that the coverage provisions of Workmen's Compensation acts should be liberally construed, but that their immunity provisions should be narrowly construed. See, Bryant v. Old Republic Insurance Co., 431 F.2d 1385 (6th Cir. 1970). However, I have definite reservations concerning the majority's finding support for such construction in what it concludes to be the inadequacy of the dollar compensation paid under the requirements of the Kentucky Act. Any such inadequacy as may exist must be the subject of legislative, not judicial, readjustment. And with all due respect, I do not find the scholarly writings of experts in the field persuasive, and in any event not controlling, in the light of the fact that the fundamental philosophy of Workmen's Compensation acts is that remuneration be provided on a no-fault basis in return for employers' immunity from common law liability.
 
 
 48
 My concern arises from the fact that in a long and thoughtful Memorandum Opinion, Judge Hermansdorfer correctly stated the factual prerequisites for a finding of immunity under the Act, and went on to find that each was satisfied under the circumstances of this case. I can find no reason to hold the following finding of fact made by Judge Hermansdorfer clearly erroneous: "The undisputed course of conduct between Blue Diamond and Scotia, considered as contracting parties, is clear. The intent of the parties as to their respective functions in the Oven Fork, Kentucky mining operation and the consideration to be exchanged between them are beyond doubt. I find a contract to exist between the parties from 1962 to date." It seems to me to be no accident that Judge Hermansdorfer used the word "find," since it appears clear that the requisite determinations constitute findings of fact. The question of the existence of an implied contract is certainly the sort of issue which, in an appropriate case, would be submitted to a jury.
 
 
 49
 The majority opinion proceeds through the litany of the requirements of a formal contract, and without difficulty demonstrates that they are not all to be found in the circumstances giving rise to the present litigation. However, it is clear that no such formal contract is required in order to provide immunity. For example, in Upper Elkhorn Coal Co. v. Thornberry, Ky.App., 564 S.W.2d 842 (1977), the Coal Company was being sued for Workmen's Compensation benefits. The Company argued that it was not a contractor under the Act, and thus not liable for benefits. A partnership owned the lease for the coal fields, and had contracted with the decedent's employer to produce coal and deliver it to Upper Elkhorn. Despite the fact that there was no contract at all with Upper Elkhorn, much less a "formal" one, the court held that the company was liable for benefits under the Act as a "contractor" because the two partners were acting for the benefit of Upper Elkhorn. It noted that the purpose of the arrangement was to secure production for Elkhorn, and that the benefit of all coal production fell to Upper Elkhorn. Similarly, in this case, there may not be a formal contract, but there is certainly an "arrangement," through which Blue Diamond obtains the benefit of the production of coal. It is worth emphasizing, too, that the majority's decision means that a parent company Cannot be held liable for Workmen's Compensation benefits owed to the employees of its subsidiary. While that result may be attractive in the present case, in the long run such a conclusion may well have more unfortunate than beneficial effects.
 
 
 50
 I would affirm the judgment of the district court.
 
 
 
 [1]
 Ky.Rev.Stat.Ann. § 342.690 (1978), the immunity section, provides:
 (T)he liability . . . under this chapter shall be exclusive and in place of all other liability of such employer to the employee . . . . For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610 . . . The exemption from liability given an employer by this section shall also extend to such employer's carrier and to all employes, officers or directors of such employer or carrier . . . .
 § 342.610(2) defines "contractor" as:
 a person who contracts with another (a) to have work performed consisting of the removal . . . of . . . mineral . . . or (b) to have work performed of a kind which is a regular . . . part of the work of the . . . business . . . of such person . . . .
 
 
 [2]
 The relevant language of the Act is quoted in note 1, Supra
 
 
 [3]
 Prosser & Wade, Cases and Materials on Torts 619 (5th ed. 1971); Prosser, Handbook of the Law of Torts § 80 (1971). See Larson, The Nature and Origins of Workmen's Compensation, 37 Cornell L.Q. 206 (1952). See also Horowitz, The Transformation of American Law 251-66 (1977); Pound, The Spirit of the Common Law 29-31, 47 (1921)
 
 
 [4]
 Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801 Et seq., as amended by the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801-78
 
 
 [5]
 See the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-78, including § 27 in which Congress "finds and declares" that "in recent years serious questions have been raised concerning the fairness and adequacy of present workmen's compensation laws in the light of . . . new risks to health and safety, and increases in the general level of wages and the cost of living." 29 U.S.C. § 676
 
 
 [6]
 See Ky.Rev.Stat. § 342.004 (1978); Bright v. Reynolds Metals Co., 490 S.W.2d 474 (Ky.1973); Peters v. Radcliff Ready Mix, Inc., 412 S.W.2d 854 (1967); Cove Fork Coal Co. v. Newcomb, 343 S.W.2d 838 (Ky.1961); Mahan v. Litton, 321 S.W.2d 243, 245 (Ky.1959) (case appears to say that the "test" of the "relationship of employer and employee" is "substantially the same" under the Act, but courts have adopted an "attitude of greater liberality in . . . compensation cases . . . than in cases . . . for tort")
 
 
 [7]
 See note 1, Supra
 
 
 [8]
 See generally, Corbin, Contracts, Chaps. 1, 4, 6 (1963); Kennedy, Form and Substance in Private Law Adjudication, 89 Harv.L.Rev. 1685, 1725-37 (1976)
 
 
 [9]
 See also Wheeler v. New York, New Hampshire and Hartford Railroad, 112 Conn. 510, 153 A. 159 (1931); Foley v. New York City Omnibus Corp., 112 N.Y.S.2d 217 (Sup.1952); Phillips v. Stowe Mills, Inc., 5 N.C.App. 150, 167 S.E.2d 817 (1969); Brown v. Morehead Oil Co., 239 S.C. 604, 124 S.E.2d 47 (1962)
 
 
 [10]
 In the case of Bryant v. Old Republic Insurance Co., discussed at pages 659-660, Supra, the insurance carrier was negligent in failing properly to carry out its duty to inspect its insured's coal mine. After the Bryant decision, the Kentucky legislature amended the Workmen's Compensation Act to give the carrier immunity from tort liability as an "employer." See note 1, Supra, and Ky.Rev.Stat. §§ 342.690(1), 342.620(4) and 342.620(5). In its third alternative argument, Blue Diamond contends in this case that it is also a "carrier" under these provisions and therefore exempt from tort liability because it acts jointly with Scotia as a self-insuror for that portion of their workmen's compensation obligation which they do not insure through insurance companies. This argument fails because the definitions of "carrier" and "self-insuror" exempt a self-insuror from tort liability only in connection with his own employees, K.R.S. § 342.620(5), and we have held that Blue Diamond is not an "employer" of Scotia's miners for purposes of the Act. Moreover, the negligence alleged against Blue Diamond did not arise from conduct or duties undertaken by Blue Diamond in its capacity as a workmen's compensation insurance carrier. Blue Diamond's fourth alternative argument that it should be exempt from common law liability because it is engaged in a "joint venture" with Scotia is also without merit for the reasons set forth in Judge Sneed's opinion in House v. Mine Safety Appliances Co., 573 F.2d 609, 619-21 (9th Cir. 1978). We do not reach Blue Diamond's fifth alternative argument that plaintiffs failed to establish the proximate cause of the explosion, and that the District Court should have granted Blue Diamond's motion for directed verdict on these grounds at the end of plaintiff's proof. The District Court has not ruled on this question, and we do not believe consideration of this question at this time is proper