Kaye **BLANTON,** et al., **Plaintiffs,**

v.

**COOPER INDUSTRIES, INC.,
et al., Defendants.**

No. CIV. A. 97–503.

United States District Court,
E.D. Kentucky.

March 29, 2000.

Donna Keene Holt, Knoxville, TN, Charles L. Cunningham, Jr., Louisville, for Kaye Blanton, Terry Lee Farley, plaintiffs.

Harry K. Herren, Jill F. Lowenbraun, Woodward, Hobson & Fulton, Louisville,

Clifford J. Zatz, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Cooper Industries, Inc., McGraw Edison Company, defendants.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter is before the court upon the defendants' motion for summary judgment [Record No. 35] and the plaintiffs' motion to strike affidavits of William Redwine and Paul R. Lees–Haley, Ph.D. from the record [Record No. 40].

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Kaye Blanton, Lisa Tolliver as executrix of the Estate of Roger Allen Blanton, Sr., and Terry Farley filed this action against Cooper Industries, Inc. and McGraw Edison Company on October 16, 1997. The action relates to injuries allegedly arising out of contamination by the National Electric Coil ("NEC") plant near Dayhoit, Kentucky, which ultimately became a Superfund site.

Kaye Blanton was born in 1945 and lived in Harlan, Kentucky for her entire life. She never lived in Dayhoit, Kentucky. In 1965, she married Roger Blanton. Mr. Blanton was employed at the NEC plant from May 1970 through December 1976, where he allegedly was exposed to harmful chemicals. Mrs. Blanton was never employed at the plant but routinely washed Mr. Blanton's work clothes, which she claims exposed her to the chemicals from the plant. In July of 1996, Mrs. Blanton was diagnosed with breast cancer. Dr. Ahmad conveyed this diagnosis to Mrs. Blanton on July 9, 1996, and Dr. Bell confirmed the diagnosis on July 12, 1996. Mrs. Blanton died on May 29, 1998. Mr. Blanton was diagnosed with pancreatic cancer on October 23, 1996 and passed away on June 2, 1997.

Terry Farley was born in 1968 and has lived in Watts Creek in Harlan County for all but approximately a year of his life. He has never lived in Dayhoit, Kentucky. However, Farley lived within two miles of the NEC plant until 1997, when he moved to Loyall, Kentucky, also in Harlan County. He was diagnosed with lymphoma in August of 1978 when he was ten years old. After treatment, his doctors determined by 1980 that his cancer was in remission, and Farley has not had any recurrences since that time. He graduated from high school but asserts that he cannot read well and can write only simple words.

In February of 1989, Kentucky officials discovered that the groundwater wells adjacent to the NEC plant were contaminated. According to the defendants, after discovery of the contamination, Cooper Industries paid for and installed city water lines near the plant so that residents would no longer need to rely on the contaminated wells for their water. Between 1990 and 1992, over 500 plaintiffs filed actions in this court seeking damages relating to the contamination. Several actions were consolidated into what has been referred to as the "*Robinett* litigation," which went to trial in April of 1996. The *Robinett* litigation was settled in October of 1996, with payments being made to the plaintiffs in November of that same year. The Environmental Protection Agency established for the NEC plant a clean-up plan which has been in place since 1992.

According to the defendants, the contamination of the NEC plant, the *Robinett* litigation, and allegations that exposure to chemicals from the NEC plant caused cancer and other health concerns were the subject of widespread reports by local, regional, and national media. From 1989 through 1994, the controversy surrounding the NEC plant was the subject of over 80 articles in the local newspaper, the *Harlan Daily Enterprise,* and 44 articles in three other regional newspapers. Many of these articles referred to cancer as a potential health hazard of the contamination.

The plaintiffs point out that when the media referred to the "Dayhoit community," Harlan County residents knew the exact location referred to and whether or not they were included. Harlan County is not one homogenous community that is synonymous with the "Dayhoit community." Rather, there are many distinct residential communities in Harlan County, and the residents know the distinctions and differences among Dayhoit, Fresh Meadows, Ewing Creek, White Star Hollow, Watts Creek, Tremont, Keith, and other community designations. According to the plaintiffs, none of the articles reported that the contamination had extended into the Watts Creek community. There was also no coverage of an alleged "air plume" that reached all of the communities mentioned above which resulted from the defendants' alleged practice of burning hazardous waste in an oil-fired boiler.

After the contamination came to light, Joan Robinett and others formed a local community group called Concerned Citizens Against Toxic Waste ("CCATW"). According to the defendants, CCATW held at least one demonstration warning of contamination by the NEC plant and was also responsible for addressing health hazards caused by the plant's operations, holding regular public meetings to discuss these issues. The U.S. Department of Health and Human Services' Agency for Toxic Substances and Disease Registry held a "public availability meeting" in Harlan in April of 1992. A subsequent report by the Department dated November 1994 addressed the community health concerns resulting from the contamination.

Joan Robinett and CCATW also conducted a survey of Harlan County residents titled the "Dayhoit Listening Project." The purpose of this survey was to gather information from people in Harlan County and to inform them that they could get assistance with medical problems related to the NEC plant contamination. Teams were trained to go door-to-door to community homes and personally interview residents by asking the questions on the survey, which related to the sources of residential water, contamination of the water, health problems related to the contamination, the community's desire for medical monitoring, etc. According to the plaintiffs, this survey was conducted in January of 1991 and did not extend into the Watts Creek community but was limited to the Dayhoit community.

Mrs. Blanton, who was awarded a business degree from Southeast Community College at Cumberland in 1967, testified that she was aware of and had generally followed the controversy regarding the nature and extent of contamination by the NEC plant in the *Harlan Daily Enterprise* since coverage began in 1989 or 1990. She testified that there was quite a bit of talk in the community in 1989 and 1990 about the contamination, the possible health effects, and the need to have city water piped into the Dayhoit community. She also testified that she was at least aware of some meetings in the community regarding the contamination and the *Robinett* litigation.

Farley testified in his deposition that Joan Robinett visited his family's home some time before August or September of 1997. The defendants contend that this visit was in connection with the Dayhoit Listening Project, but Farley understood that the purpose of Robinett's visit was to garner support for a water line to Watts Creek. Ms. Robinett spoke primarily with Farley's mother. He apparently signed some papers in connection with the survey but claims that he did not know what they were about.

According to the defendants, Farley has a number of relatives and friends in Harlan County, several of whom brought a lawsuit relating to the NEC plant contamination. However, Farley claims that none of these friends or relatives ever mentioned their lawsuits to him and that he knew nothing about the litigation or his family's or friends' involvement. Also according to the defendants, Farley partici-

pated in the "Shira Kramer study," which was commissioned by the plaintiffs in the *Robinett* litigation. The study indicates that individuals were ascertained by verification of exposure status via interview, and Farley's name appears as a participant in the study. Farley claims that he signed a medical release authorization but thought that it was connected to efforts to extend city water lines to Watts Creek, and that this was his only alleged "participation" in any study conducted by Shira Kramer.

## II. MOTION FOR SUMMARY JUDGMENT

The defendants have filed a motion for summary judgment arguing (1) that Mrs. Blanton's and Farley's claims are barred by the applicable one-year statute of limitations, KRS § 413.140(1); and (2) that Mr. Blanton's claim is barred by the exclusive remedies provision of the Kentucky Workers' Compensation Law, KRS § 342.690. The court will address the issues presented in turn.

### A. *Statute of Limitations*

■ The discovery rule was adopted in Kentucky in *Tomlinson v. Siehl*, 459 S.W.2d 166 (Ky.1970), a medical malpractice action. It was first applied to a cause of action involving a latent disease caused by exposure to a harmful substance in *Louisville Trust Co. v. Johns–Manville Products Corp.*, 580 S.W.2d 497 (Ky.1979), wherein a plaintiff was exposed to asbestos fibers in the course of his work. In the *Johns–Manville* case, the Kentucky Supreme Court adopted the following statement from New Hampshire's highest court:

> "A cause of action will not accrue under the discovery rule until the plaintiff *discovers or in the exercise of reasonable diligence should have discovered* not only that he has been injured but also that his injury may have been caused by the defendant's conduct."

*Id.* at 501 (quoting *Raymond v. Eli Lilly & Co.*, 117 N.H. 164, 371 A.2d 170, 174

(1977)) (emphasis supplied). This rule applies where the injury and the discovery of the causal relationship do not necessarily occur simultaneously. In *Johns–Manville*, for example, the plaintiff's injury manifested itself more than one year after the date of the plaintiff's last exposure.

■ The Kentucky Supreme Court further explained in *Perkins v. Northeastern Log Homes*, 808 S.W.2d 809 (Ky.1991), that the discovery rule has two components. The statute of limitations commences from the date the plaintiff knew or should have known not only (1) that he or she has been injured; *but also* (2) that his or her injury may have been caused by the defendant's conduct. *Id.* at 819. The date that a party "discovers" that he or she may *sue* for a wrong is not considered. *Conway v. Huff*, 644 S.W.2d 333, 334 (Ky. 1982) (rejecting the argument that the statute of limitations begins to run from the date plaintiffs discovered they had a cause of action).

■ In the present case, both Mrs. Blanton and Farley knew prior to October 16, 1996 that they had been injured. However, the cause of their injuries was not known at the time the injuries manifested themselves and became apparent only at some later date. The defendants' motion requires a determination of that later date. "When the injury would not necessarily indicate the presence of negligence, the cause of action accrues when the plaintiff knows or should have known of the possible negligence." *Imes v. Touma*, 784 F.2d 756, 758 (6th Cir.1986) (applying Kentucky law, holding that whether plaintiff should have known that the injury was a result of negligence was a fact question not properly decided on summary judgment). Pursuant to the *Imes* case, the court acknowledges that summary judgment may not generally be appropriate when determining this issue, but is appropriate if the plaintiffs can prove no set of facts to support a verdict in their favor.

The discovery rule focuses not on when a plaintiff has actual knowledge of a legal cause of action, but whether a plaintiff acquired knowledge of existing facts sufficient to put the party on inquiry. "Reasonable diligence" is required of plaintiffs. Kentucky courts have not precisely defined this term in the discovery rule context but have interpreted identical statutory language to represent "a degree between absolute inaction and an extreme effort undertaken against apparent futility[;] it must be more than merely perfunctory." *Gray v. Sawyer*, 247 S.W.2d 496, 498 (Ky.1952). One court applying Kentucky law has noted that "[a]ny fact that should excite his suspicion is the same as actual knowledge of his entire claim ... [and] the means of knowledge are the same thing in effect as knowledge itself." *Hazel v. General Motors Corp.*, 863 F.Supp. 435, 440 (W.D.Ky.1994) (citations omitted).

Other courts have defined this concept. One court noted the following:

> "Reasonable diligence" means that a plaintiff must be as diligent "as the great majority of persons would [be] in the same or similar circumstances." ...
> "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." ... The question of whether plaintiffs exercised reasonable diligence is ordinarily one of fact, to be determined by the fact-finder.

*Sawyer v. Midelfort*, 227 Wis.2d 124, 595 N.W.2d 423, 439 (1999) (citations omitted). Another court defined "reasonable diligence" to require that "the plaintiff's actions must be evaluated to determine whether he exhibited 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.' " *Cappelli v. York Operating Co.*, 711 A.2d 481, 488 (Pa.Super.Ct.1998) (quotations omitted). However, that court also noted that the concept of reasonable diligence "is sufficiently flexible ... to take into account difference[s] between persons and their capacity to meet certain situations and circumstances confronting them at the time in question.... [but f]ailure to make inquiry when information is available is failure to exercise reasonable diligence as a matter of law." *Id.* (quotations omitted). The South Carolina Supreme Court has held that "the 'exercise of reasonable diligence' means the injured party must act with some promptness where the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist." *True v. Monteith*, 327 S.C. 116, 489 S.E.2d 615, 617 (1997).

The defendants contend that the media coverage of the contamination was so widespread and pervasive that anyone exercising ordinary, reasonable care and diligence should have discovered the cause of their injuries prior to October 16, 1996. The plaintiffs essentially respond that because the coverage referred to the "Dayhoit community" rather than the plaintiffs' specific communities that this is a question of fact. Most of the plaintiffs' response is directed to whether they had subjective knowledge of their injuries and the cause. However, this is not the only factor that the court must consider—the court must also determine when they *should have known* of the cause of their injuries and whether they exercised reasonable diligence.

With all of the information available to these two plaintiffs, particularly Mrs. Blanton, the court finds that a person exercising reasonable diligence would have discovered the cause of the injuries prior to October 16, 1996 or one year prior to the date this suit was filed. Farley's claim that he did not know anything at all about the contamination until he saw his friends driving new cars is not plausible. His claim that he never heard anyone talk about the contamination, never heard any-

thing on the radio about it, or never saw anything on TV about it is also difficult to believe. More to the point, however, these claims demonstrate that he failed to exhibit the qualities of "attention, knowledge, intelligence and judgment" that society requires of its members for their own protection. *Cappelli*, 711 A.2d at 488. Taking into account Farley's illiteracy and his particular intellectual capacity, his failure to make any inquiry despite having sufficient information available to him is deemed a failure to exercise reasonable diligence as a matter of law and Farley's claim will be dismissed.

As to Mrs. Blanton, she does not state what the alleged "trigger" was for her decision to file suit, but admitted that she knew what was going on at NEC as early as 1989 or 1990. Further, Mrs. Blanton likely had more knowledge than the average Harlan County resident available to her because of her husband's condition. Given this, her failure to make any inquiry is also deemed a failure to exercise reasonable diligence.

As noted by the defendants, there were hundreds of plaintiffs involved in the *Robinett* litigation who did not live in the Dayhoit community, but put two and two together to conclude that the NEC plant was the cause of the injuries. The instant plaintiffs were under a similar obligation of inquiry.

[redacted] Regarding the doctrine of equitable tolling, the plaintiffs allege that the defendants used various "indirect means" to conceal their culpability. However, the defendants are correct that the plaintiffs have not alleged that any of the defendants' actions actually caused the plaintiffs not to file suit. Neither Mrs. Blanton's nor Farley's suit was triggered by the discovery of the conduct alleged by the plaintiffs to constitute the "indirect means." The statute cannot be tolled without at least some connection. *Reuff-Griffin Decorating Co. v. Wilkes*, 173 Ky. 566, 191 S.W. 443, 446 (1917) (requiring the defendant's conduct to be the reason a party was prevented from proceeding).

### B. *Workers' Compensation Act Exclusive Remedy Provision*

[redacted] The defendants have also moved for summary judgment on the claim of Mr. Blanton, who was employed at the NEC plant from May of 1970 through December of 1976. He was diagnosed with pancreatic cancer on October 23, 1996 and passed away on June 2, 1997. The defendants contend that Mr. Blanton's claim is barred by the exclusive remedy provision of Kentucky's workers' compensation law, KRS § 342.690. Pursuant to this provision, if the employer secures payment of compensation as required by the workers' compensation law, then liability of that employer is exclusive under the Workers' Compensation Act.

Section 342.610(4) of the Kentucky Revised Statutes states in relevant part as follows:

> If injury or death results to an employee through the deliberate intention of his employer to produce such injury or death, the employee or his dependents may take under this chapter, or in lieu thereof, have a cause of action at law against the employer as if this chapter had not been passed, for such damage so sustained by the employee, his dependents or personal representatives as is recoverable at law. If a suit is brought under this subsection, all right to compensation under this chapter shall thereby be waived as to all persons. If a claim is made for the payment of compensation or any other benefit provided by this chapter, all rights to sue the employer for damages on account of such injury or death shall be waived as to all persons.

*Id.* This is sometimes referred to as the "deliberate intention" exception to the exclusive remedies provision of the Workers' Compensation Act. In other words, an injured employee such as Mr. Blanton must elect his remedies; if he chooses to sue

under this subsection, he waives any recovery under the workers' compensation laws and if he chooses to make a claim under the workers' compensation laws, he waives his cause of action at common law. In this case, Mr. Blanton has chosen to sue and, therefore, has waived any recovery he may have otherwise been entitled to under the workers' compensation law.

■ The plaintiff relies on *Zurich American Ins. Co. v. Brierly*, 936 S.W.2d 561 (Ky.1996), in response to the defendants' argument that the "deliberate intention" exception does not apply. In *Zurich*, an employee was killed in an explosion while employed by Alusuisse Flexible Packaging, which was insured by the plaintiff. A coroner's jury determined that the employer had "deliberately placed the decedent . . . in a known, unsafe, and hazardous position" resulting in his death. Based upon this, the estate filed a complaint in court, seeking to dismiss an earlier-filed workers' compensation claim on the grounds that the estate had elected its tort remedy in lieu of any workers' compensation benefits. The court stated as follows:

> It is the holding of this Court that KRS 342.610(4) provides an exception to KRS 342.325 to the effect that if the death of an employee is the result of the deliberate intention of the employer to cause the death, the dependents of the employee may either proceed under Chapter 342 [the workers' compensation law], or in lieu thereof, sue at law, as if Chapter 342 had never been adopted. In the event the dependents of the decedent choose to sue in civil court, all rights to compensation under Chapter 342 are waived. The statute clearly provides a choice to the dependents to either take under the chapter or to file a civil lawsuit.

*Id.* at 564.

The plaintiff argues that the Kentucky Supreme Court held in *Zurich* that allegations that the employer deliberately placed the decedent in a known, unsafe and haz-

ardous position "grant jurisdiction to the circuit court for a tort case and if they are proven valid a cause of action is stated." This court does not read the *Zurich* opinion so broadly. Rather, *Zurich* simply holds that a claim under the workers' compensation laws and a tort action at law based on the "deliberate intention" exception are mutually exclusive. The *Zurich* court did not address whether the allegations stated above are sufficient to state a cause of action.

The court in *Fryman v. Electric Steam Radiator Corp.*, 277 S.W.2d 25 (Ky.1955), faced a similar question. There, the plaintiff was injured by a press he was operating. He alleged that his employer was notified of the unsafe condition of the machine but, despite these warnings, permitted the plaintiff to continue to work on the machine without knowledge of the defect or without safety devices. The allegations were that deliberate intention arose from the employer's acts or omissions. The court held that these allegations were not sufficient to state that the employer had acted with "deliberate intention" to harm the employee. *Id.* at 26. To have deliberate intention, "the employer must have determined to injure an employee and used some means appropriate to that end, and there must be a specific intent." *Id.* at 27.

In *McCray v. Davis H. Elliott Co.*, 419 S.W.2d 542 (Ky.1967), the court reached a similar conclusion. There, the plaintiff alleged that the decedent's employer had intentionally directed the decedent to work on a tall pole in an extremely dangerous and hazardous place in close proximity to a highly charged wire carrying many thousands of volts of electricity, knowing that decedent was inexperienced, and further failed to provide him with the necessary equipment to deaden the live wires with which he was working. This was held insufficient to allege "deliberate intention" under the statute.

The plaintiff in this case has not alleged or produced any evidence that the defendants either determined to injure the employees or had any specific intent to this end. The statutory language, coupled with the Kentucky Supreme Court's response to the request for certification in the *Robinett* litigation, is clear and straightforward. Mr. Blanton alleges that the defendants knew that the chemicals were harmful, knew that they caused cancer, knew that employees would be exposed, but never said anything and never took measures to reduce or alleviate the risk to employees. However, he does not produce any evidence that this was done to harm the employees. Mr. Blanton could have applied for workers' compensation benefits, but failed to do so. Because he cannot show that the deliberate intention exception applies in this case, his claim must be dismissed.

The court finds that the remainder of the plaintiff's arguments are without merit. *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky.1992), does not require a different conclusion and actually undermines the plaintiff's argument. *Id.* at 819 (quoting approvingly a Michigan case that holds that the workers' compensation statute preempts common law tort claims). The KOSHA provisions further do not provide for a private right of action. KRS § 338.021(2); *Childers v. International Harvester Co.*, 569 S.W.2d 675, 677 (Ky.Ct. App.1977). The court finds that the "willful and unprovoked physical aggression" exception in KRS § 342.690(1) does not apply to this cause of action. Also, *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655 (6th Cir.1979), does not save plaintiff's claims. In *Boggs*, unlike here, the independent negligence engaged in by the parent corporation took place during the employee's tenure with the employer. In contrast, Cooper Industries had no relationship, involvement, or contact with the NEC plant as a parent or otherwise during Mr. Blanton's employment.

## III. MOTION TO STRIKE

The plaintiffs have also filed a motion to strike the supporting affidavits of William Redwine and Paul R. Lees–Haley, Ph.D. The court has not relied on either of these affidavits in reaching its conclusions and, therefore, plaintiffs' motion will be denied.

## IV. CONCLUSION

In accordance with the foregoing,

**IT IS HEREBY ORDERED AND ADJUDGED:**

(1) that the defendants' motion for summary judgment [Record No. 35] is **GRANTED;**

(2) that the plaintiffs' motion to strike affidavits of William Redwine and Paul R. Lees–Haley, Ph.D. from the record [Record No. 40] is **DENIED;**

(3) that the plaintiffs' claims against the defendants are **DISMISSED WITH PREJUDICE;**

(4) that this matter shall be STRICKEN from the docket of the court; and

(5) that this is a final and appealable order.