RENDERED: MARCH 25, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0704-MR

CHRISTOPHER RYAN CUNNINGHAM                    APPELLANT


APPEAL FROM BOYLE CIRCUIT COURT
v.          HONORABLE DARREN W. PECKLER, JUDGE
ACTION NO. 19-CI-00347


KROGER LIMITED PARTNERSHIP I                    APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; CETRULO AND GOODWINE,
JUDGES.

CLAYTON, CHIEF JUDGE: Christopher Ryan Cunningham appeals from a

Boyle Circuit Court order granting summary judgment to Kroger Limited

Partnership I ("KLP I"). KLP I owns and operates a Kroger grocery store in

Danville, Kentucky. Cunningham, a truck driver employed by Penske Logistics,

LLC, was injured while making a delivery to the store. At issue is whether, under

the Kentucky Workers' Compensation Act, KLP I is immune from suit as an up-the-ladder employer. Having reviewed the record, the appellant's arguments, and the applicable law, we affirm.

In 2014, Penske entered into a Carrier Services Agreement ("Agreement") with Kroger Limited Partnership II ("KLP II"). The latter entity is described in the Agreement as "an Ohio limited partnership on behalf of Winchester Farms Dairy, a manufacturing facility[.]" Under the terms of the Agreement, Penske agreed to accept KLP II's "freight tendered to it by third parties for delivery to [KLP II's] facilities and to the facilities of all divisions, subsidiaries or affiliates of [KLP II], whether owned or leased." Penske further agreed to "load, unload (if applicable) and deliver the freight promptly and efficiently and strictly in accordance with the terms of [the] Agreement."

According to the affidavit of Erik B. Lutson, an insured litigation paralegal in the law department of The Kroger Company, KLP II is a subsidiary of The Kroger Company, which in turn is a limited partner of KLP I.

According to the affidavits of Greg Dean, the store manager of KLP I, the Danville store received approximately four Kroger warehouse deliveries of retail merchandise per day, six days per week, and two warehouse deliveries of merchandise one day per week. Of these deliveries, approximately four came from Winchester Farms Dairy. When the store needed more dairy products, Dean would

enter an order through the store's computer assisted ordering system which submitted an order directly to Winchester Farms Dairy. When the truck with the order arrived at the store, KLP I employees would meet the driver at the back door, aid in unloading the truck, and direct the driver in the delivery of the goods.

In his deposition, Cunningham testified that he delivered goods to the Save A Lot distribution center "a couple of times," but the majority of his work for Penske consisted of delivering milk from KLP II to Kroger grocery stores.

On September 24, 2018, Cunningham was injured when a dock door fell on him while he was delivering dairy products from KLP II to the Danville Kroger. Cunningham filed a workers' compensation claim against Penske, and received medical expenses of $30,334.61, temporary total disability benefits of $29,482.42, and a lump sum payment of $33,000.

Cunningham filed suit against KLP I, alleging negligence and seeking damages for medical expenses, lost wages, and pain and suffering. Following the exchange of written discovery and the taking of Cunningham's deposition, the trial court granted summary judgment to KLP I as an up-the-ladder employer who was immune from suit under the Workers' Compensation Act. This appeal by Cunningham followed.

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any

material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); Kentucky Rules of Civil Procedure ("CR") 56.03. The trial court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). On the other hand, "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482. "An appellate court need not defer to the trial court's decision on summary judgment and will review the issue *de novo* because only legal questions and no factual findings are involved." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 705 (Ky. App. 2004).

Kentucky's Workers' Compensation Act contains an exclusive liability provision, which states that "[i]f an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee[.]" Kentucky Revised Statutes ("KRS") 342.690(1). Consequently, "[t]he injured worker is not entitled to tort damages from the employer or its employees for work-related injuries." *Beaver v. Oakley*, 279 S.W.3d 527, 530 (Ky. 2009).

For purposes of invoking this immunity, the term "employer" includes "contractors" as defined in the Act. It states: "A person who contracts with another . . . [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person shall for the purposes of this section be deemed a contractor, and such other person a subcontractor." KRS 342.610(2)(b).

Thus, "[i]f a defendant qualifies as a contractor, 'it has no liability in tort to an injured employee of a subcontractor.'" *Cabrera v. JBS USA, LLC*, 568 S.W.3d 865, 869 (Ky. App. 2019) (quoting *Fireman's Fund Ins. Co. v. Sherman & Fletcher*, 705 S.W.2d 459, 461 (Ky. 1986)). "In other words, tort immunity under the Act extends 'up the ladder' from the subcontractor that employs an injured person to the entities that contracted with the subcontractor, so long as the injured person's employer has workers' compensation coverage, and the up the ladder entities contracted 'to have work performed of a kind which is a regular or recurrent part of the work' of their business." *Id.* (citation omitted).

A defendant seeking to assert exclusive remedy immunity "must both plead and prove the affirmative defense. Even when the underlying facts are undisputed, a conclusion that a defendant is entitled to judgment as a matter of law must be supported with substantial evidence that a defendant was the injured worker's statutory employer under a correct interpretation of KRS 342.610(2)(b)."

*General Elec. Co. v. Cain*, 236 S.W.3d 579, 585 (Ky. 2007), *as corrected* (Aug. 30, 2007), *as modified on denial of reh'g* (Nov. 21, 2007).

Cunningham argues that KLP I is not entitled to up-the-ladder immunity because it is a distinct legal entity from KLP II, and they operate distinct businesses. He concedes that KLP II, the dairy manufacturer, is likely entitled to "up-the-ladder immunity" as a direct contractor with Penske and hence with Cunningham. By contrast, he contends, KLP I is not an "up-the-ladder" employer because it was not a party to the contract between Penske and KLP II, nor was Penske hired to perform work for KLP I. Affording immunity to KLP I is, in his view, an unwarranted horizontal expansion of immunity to encompass a sibling entity, as opposed to a parent.

In granting summary judgment to KLP I, the trial court relied on *Cabrera, supra*, in which this Court addressed the meaning of two key elements of KRS 342.610(2)(b): (1) what constitutes a contract and (2) what constitutes a regular or recurrent part of the work, for purposes of invoking up-the-ladder immunity.

Cabrera was injured while performing sanitation services at a pork processing facility jointly operated by JBS and Swift Pork. Cabrera's direct employer was Packers Sanitation Services, which had a written contract with JBS to perform the sanitation services at the facility. Swift was the owner of the pork

processing facility and a wholly-owned subsidiary of JBS. It was not a signatory to the contract with Packers. Swift and JBS shared the same chief executive officer, board of directors, and corporate headquarters. *Cabrera*, 568 S.W.3d at 871.

Cabrera argued that Swift was not entitled to immunity because it never employed him directly and was not a party to the contract with his employer, Packers Sanitation. The Court rejected these arguments, because the Workers' Compensation Act "does not demand evidence of formal written contracts between a defendant [Swift] and the plaintiff's direct employer [Packers] for the defendant to have up-the-ladder immunity[.]" *Id.* at 870 (quoting *Beaver*, 279 S.W.3d at 534). Rather, what is required is a showing that "the defendant is effectively functioning as the contractor . . . even if the evidence would not establish a binding contract for purposes of a breach of contract action, for instance[.]" *Id.* (quoting *Beaver*, 279 S.W.3d at 534). The Court stressed that the term "contract" was construed "broadly in this context to ensure that workers' compensation coverage is provided allowing injured workers to recover benefits quickly without having to show fault." *Id.* (quoting *Beaver*, 279 S.W.3d at 535).

The Court held that what was necessary to demonstrate that Swift was effectively functioning as a contractor was "that when JBS contracted with Packers, it did so as a representative and for the benefit of Swift Pork" and that

-7-

Swift's "omission from that contract was merely a facet of the financial arrangement between Swift and JBS." *Id*. at 870-71.

Applying this test, the Court concluded that JBS was acting as Swift Pork's representative and for Swift Pork's benefit when it entered into the Packers contract, because it benefitted the joint business operations of JBS and Swift Pork, and JBS was effectively representing Swift Pork's interests by hiring Packers to clean the pork processing facility they jointly operated. *Id.* at 871.

As to the other element of KRS 342.610(2)(b), which requires a showing that the work contracted for was a regular or recurrent part of the business, Cabrera argued that, notwithstanding Packers Sanitation's contract with JBS, JBS was not an up-the-ladder employer because there was no evidence that JBS employees were trained to perform or ever did perform sanitation services at the pork processing facility. The Court disagreed, stating:

> whether JBS employees ever performed this type of work with its own employees or had employees skilled enough or trained to do it is not dispositive of this issue. Persons or entities who engage another to perform a part of the work which is a recurrent part of their business, trade, or occupation are considered "contractors" under the Act even if they *never* perform that type of work with their own employees.

*Cabrera*, 568 S.W.2d at 869-70.

The Court concluded that JBS was an up-the-ladder employer because the sanitation services Cabrera was performing were mandated by federal law for

-8-

meat processing facilities and were consequently a recurrent and regular part of JBS's business. *Id.* at 870.

If we apply these principles to the case before us, we conclude that the trial court correctly granted summary judgment to KLP I.

First, although KLP I was not a signatory to the contract between Penske and KLP II, when KLP II contracted with Penske, it did so as a representative and for the benefit of KLP I. The contract between Penske and the dairy producer facilitated the delivery of milk to the Kroger grocery store, as evidenced by the regular deliveries to the store and the store manager's ability to order more products via the computer assisted ordering system between KLP I and KLP II. KLP I and KLP II, like Swift and JBS, were linked at the corporate level by their relations to The Kroger Company, and the contract with Penske was in furtherance of their joint business interests of selling dairy products to the public.

Cunningham disputes this conclusion, relying on *Becht v. Owens Corning Fiberglas Corporation*, 196 F.3d 650, 652 (6th Cir. 1999), which distinguished between subsidiaries and divisions for purposes of up-the-ladder immunity. In *Becht*, the claimant was injured while working for OCSC and it was disputed whether OCSC was a subsidiary or a division of Owens-Corning. The Sixth Circuit Court of Appeals explained that "if OCSC, the entity that employed Becht, is a subsidiary, rather than a division, of Owens-Corning, then Owens-

Corning would not be immune from tort liability based on the immunity of the subsidiary. Conversely, if OCSC is a division of Owens-Corning, then Owens-Corning would be immune from suit based on the workers' compensation exclusive remedy provision." *Id.* at 654 (citation omitted).

In drawing this distinction, *Becht* relied on an earlier opinion, *Boggs v. Blue Diamond Coal Company*, 590 F.2d 655, 663 (6th Cir. 1979), which held that there is no contractual relationship between a principal and subsidiary, and consequently no up-the-ladder immunity. The opinion states: "[T]he 'functional relationship' between a parent and a subsidiary is not a contractual relationship. The expectations of the parties are not based on mutual promises, consideration or consent, for one party owns and has custody of the other party. The relationship between parent and subsidiary is based upon the status of the parties and is more like the relationship between parent and child, warden and prisoner, and other similar relationships. The relationship is not based upon the bargaining power of the parties." *Id.* at 661.

This view of the parent and subsidiary relationship has been modified by the more flexible approach adopted in our recent case law. As we have previously discussed, in *Cabrera*, this Court held that Swift, a wholly-owned subsidiary of JBS, did have up-the-ladder immunity even though Swift was not a signatory to the JBS-Packers contract.

-10-

Second, the work being performed by Penske/Cunningham was a regular and recurrent part of KLP I's business as a retail grocery store; deliveries were made on a recurrent basis in order to keep the grocery store stocked with milk and KLP I's own employees routinely engaged in receiving and unloading the deliveries made by Cunningham. On the basis of the evidence in the record, the delivery and unloading of dairy products was a regular and recurrent part of the business of the retail grocery store.

Cunningham disputes this conclusion, relying on *Olmstead v. Shakespeare*, 581 S.E.2d 483 (S.C. 2003), in which a manufacturer of fiberglass poles hired a common carrier to ship the finished product to a customer in another state. The driver was injured loading the poles onto the truck at the manufacturer's warehouse. Under South Carolina law, the manufacturer was entitled to up-the-ladder immunity upon a finding that the common carrier "engaged in activity that is part of [the owner's] trade, business, or occupation." *Id*. at 485. The South Carolina Supreme Court held "the fact that it was important to [the manufacturer] to deliver its finished product to its customer in order to consummate a sale does not render the delivery of its products an important part of its business for purposes of statutory employment." *Id.* at 485-86. The Court cautioned that the transportation of goods by a common carrier alone, without something more, does not qualify as "part of [the owner's] trade, business, or occupation[.]" *Id*. at 486.

*Olmstead* is not binding precedent in Kentucky and, in any event, is distinguishable, as Cunningham's case involves more than the transportation of goods by a common carrier. KLP I and KLP II had an ongoing business relationship involving the recurrent and regular ordering and delivery of grocery products by Penske, to the mutual benefit of KLP I and KLP II.

Cunningham's situation is directly analogous to that of the delivery truck driver in *Black v. Dixie Consumer Products LLC*, 835 F.3d 579 (6th Cir. 2016). Black was a trucker employed by Western Express, which had a contract to deliver raw paper to Dixie, a manufacturer of paper cups and plates. Black was injured during the unloading process at the factory. Dixie sought immunity on the grounds that Black's work was not a customary, usual, or normal part of Dixie's business, was not work that Dixie repeated with regularity, or work that Dixie or similar businesses normally performed or expected to perform with employees. *Id*. at 585.

The Sixth Circuit Court of Appeals disagreed. It observed that the delivery of raw paper materials to Dixie occurred on a regular or recurrent basis, with Dixie receiving as many as fifty truck shipments of these materials during a typical week. *Id*. "Unless Dixie entered the business of producing raw paper . . . , it necessarily needed to receive and unload regular deliveries of raw paper." *Id*. at 585-86. Further, the evidence showed that Dixie was responsible for unloading the

product out of the truck and other evidence was offered that similar manufacturers utilize private fleets of trucks to make similar deliveries. "Even though Dixie may never perform that particular job with [its] own employees, [it] is still a contractor if the job is one that is usually a regular or recurrent part of [its] trade or occupation." *Id.* at 586 (citing *Fireman's Fund*, 705 S.W.2d at 462) (internal quotation marks omitted).

It is undisputed that KLP I received regular shipments of dairy products from KLP II which KLP I was incapable of producing itself and which had to be received and unloaded in order to conduct its retail grocery business. The evidence was also undisputed that KLP I's own employees actually directed and assisted in the unloading of the deliveries. Penske's deliveries were an integral part of the business of running the grocery store and indisputably meet the standard of KRS 342.610(2)(b).

Cunningham also raises significant policy concerns, arguing that the immunity provisions of the Workers' Compensation Act should be narrowly construed as they are in derogation of common law rights. He contends that, but for the corporate kinship existing between KLP I and KLP II, the present case would be indistinguishable from a traditional third-party tort claim, such as that in *Wallingford v. Kroger Company*, 761 S.W.2d 621 (Ky. App. 1988), which involved a delivery truck driver for Coca Cola who slipped and fell on an icy ramp

at a Kroger store. The case addressed whether he was an invitee for purposes of tort liability and whether Kroger owed him a legal duty of care. No mention is made of a workers' compensation immunity defense for Kroger. But if Wallingford had been an employee of a carrier which had a contract with a corporate relative of the Kroger store, to perform the kind of work which was a regular or recurrent part of the business, Kroger may well have pled the defense of statutory immunity.

Cunningham argues that defendants are improperly using complex corporate structures to evade tort liability and are engaging in defensive piercing of the corporate veil to shield up-the-ladder entities. "The purpose of KRS 342.610(2)(b) is not to shield owners or contractors from potential tort liability but to assure that contractors and subcontractors provide workers' compensation coverage." *Cain*, 236 S.W.3d at 587. In order to achieve this goal, the precedent set forth in opinions such as *Cain* and *Cabrera* demands a highly fact-specific approach to assessing statutory immunity. This entails looking beyond formal corporate structures to the actual functional interaction of the parties. The trial court appropriately adopted this method.

For the foregoing reasons, the summary judgment of the Boyle Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Albert B. McQueen, Jr.
Lexington, Kentucky

BRIEF FOR APPELLEE:

Angela M. Call
Allyson S. Cave
Campbellsville, Kentucky