**Lee Anne THOMPSON, et al., Plaintiffs,**

v.

**John FARE, Jr., et al., Defendants.**

**Nos. CIV.A. 01–223, CIV.A. 01–224.**

United States District Court, E.D. Pennsylvania.

Nov. 21, 2001.

Cathleen M. Devlin, Saul, Ewing, Remick and Saul, Philadelphia, PA, Daniel S. Weinstock, Shrager, Spivey, Sachs & Weinstock, Philadelphia, PA, Thomas William Malone, Office of Thomas William Malone, Atlanta, GA, Mark L. Stuckey, Law Offices of Charles L. Ruffin, Macon, GA, Stanley H. Friedman, Friedman & Martin, Savannah, GA, H. Andrew Owen, Owen Gleaton Egan Jones & Sweeney, LLP, Atlanta, GA, for Lee Anne Thompson.

Cathleen M. Devlin, Saul, Ewing, Remick and Saul, Philadelphia, PA, Daniel S. Weinstock, Shrager, Spivey, Sachs & Weinstock, Philadelphia, PA, Harry A. Wilson, Jr., D. Bruce Kehoe, Wilson Kehoe & Winingham, Indianapolis, IN, H. Andrew Owen, Owen Gleaton Egan Jones & Sweeney, LLP, Atlanta, GA, for Mary Schalliol.

Kevin J. Ruane, Francis R. Gartner & Associates, Blue Bell, PA, David N. Zeehandelaar, Blank Rome Comisky & McCauley, LLP, Philadelphia, PA, Joseph Michael Lamonaca, Chadds Ford, PA, J. Arthur Mozley, Mozley Finlayson & Loggins LLP, Atlanta, GA, for John Fare, Jr., Hart Corp./Delware Div.

Scott A. Coffina, Assist. U.S. Atty., Philadelphia, PA, Terence M. Healy, U.S. Dept. of Justice, Washington, DC, Rodney Patton, U.S. Dept. of Justice, Torts Branch, Washington, DC, for U.S.

### *MEMORANDUM AND ORDER*

KATZ, Senior District Judge.

This case involves claims of negligence arising out of a fatal airplane crash. Now before the court is a motion for summary judgment on the grounds that the claims against the pilot and a corporation are barred by the exclusive remedy provisions of the Pennsylvania Workmen's Compensation Act (WCA), 77 PA.CONS.STAT. §§ 1 et seq. (2001), because the pilot and the plaintiff passengers were employed by the same entity. As discussed below, the motion is denied because the pilot was not employed, for the purpose of the WCA, by the same entity as either of the plaintiff passengers.

### I. *Background*

On January 18, 2000, while landing in Somerset, Kentucky, an airplane collided

with an air traffic control tower. All four persons aboard were killed, including John Fare, Jr., the pilot, and B. Kenin Hart, Dennis Schalliol and Loy D. Thompson, IV, who were investigating real properties on behalf of a national real estate brokerage conglomerate. At the time of the crash, the real estate conglomerate was engaged in brokering the purchase and sale of industrial facilities, such as warehouses and factories. The conglomerate was comprised of the Hart Corporation and its approximately twenty wholly-owned subsidiaries. According to the defendants, the conglomerate concentrated its management and operations mainly in one subsidiary, Hart Corporation/National Division (Hart National), with each of the other subsidiaries separately incorporated in a different state for tax and state real estate licensing purposes. The exception was Hart Corporation/Delaware Division (Hart Delaware), a wholly-owned and separately incorporated subsidiary that held title to the airplane piloted by Fare.

Passenger Hart was the chairman, sole owner and chief officer of the Hart Corporation, as well as the chief officer of each of the subsidiaries. Passengers Thompson and Schalliol were brokers/salesmen with responsibilities pertaining to certain territorial regions. The flight in question was transporting all three men to certain manufacturing facilities that they planned to inspect with a view towards securing the brokerage rights for the properties. Plaintiffs are representatives of the estates of passengers Schalliol and Thompson.

The moving defendants are the representative of the estate of pilot Fare, who is being sued for negligent piloting, and Hart Delaware, the aircraft's corporate owner.[1]

The identity of the parties' employers is critical in this case because the WCA provides the exclusive remedy for workplace-injury actions between two people "in the same employ" at the time of the injury. 77 PA.STAT. § 72 (2001). The thrust of the defendants' motion for summary judgment is that both Thompson and Fare were in fact employed by Hart National, the alleged central office of the real estate conglomerate. If true, because it is not disputed that passenger Schalliol worked for Hart National, all three parties would be employed by the same entity, and all of the plaintiffs' claims would be extinguished pursuant to the exclusive remedy provision of the WCA. Under plaintiffs' theory, however, Fare was employed by Hart Delaware, the subsidiary that owned the plane, and Thompson was employed by Hart Southeast, the subsidiary with offices in Roswell, Georgia from which Thompson generally worked on a daily basis. Thus, according to plaintiffs, each of the plaintiffs and the defendant pilot worked for a different employer.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

1. The representatives of the estates of Schalliol and Thompson originally initiated separate lawsuits. The cases were consolidated on May 14, 2001 and plaintiffs jointly filed an amended complaint on June 8, 2001. Plaintiffs Schalliol and Thompson also bring suit against the United States for the allegedly negligent conduct of its air traffic controllers, and defendant Fare has also stated a cross-claim against the United States. In addition, a third case, brought by a representative of the estate of Mr. Hart against the United States, has also recently been consolidated with the instant action. However, the United States is not a moving defendant at this time. In accordance with the previous Orders issued in this case, the parties will have an opportunity to submit further motions for summary judgment.

with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* FED. R.CIV.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter; rather, it determines whether or not there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. *Workmen's Compensation Act*

The WCA provides that "[i]f disability or death is compensable under this act, a person shall not be liable to anyone at common law or otherwise on account of said disability or death for any act or omission occurring while such person was in the same employ as the person disabled or killed, except for intentional wrong." 77 PA.STAT. § 72. The WCA does not de-fine "employee" or "employer," but provides that the former is "synonymous with servant" and that the latter is "synonymous with master." *Id.* at §§ 21–22. Thus, in order to determine whether an employer-employee relationship exists, Pennsylvania courts generally apply the test used to determine whether a master-servant relationship exists. *See Kiehl v. Action Mfg. Co.*, 517 Pa. 183, 535 A.2d 571, 573 (1987). In this context, an employer is one who "maintains control or the right to control the work to be done and the manner of doing it." *Id.* (citing *Venezia v. Philadelphia Electric Co.*, 317 Pa. 557, 177 A. 25 (1935)).

However, where there are two affiliated corporations, and the task at hand is to determine which is the legal employer of an injured employee, the inquiry does not begin with the traditional right-to-control analysis. Rather, the Pennsylvania Supreme Court has stated that

> in a situation wherein the issue is which of two corporations, one being a wholly-owned subsidiary of the other, is the employer of an injured employee, the problem of determining the question of control can properly be resolved only by a consideration of the functions performed by every interested party—each corporation and the injured employee—in addition to other indicia of control.... [T]he courts must analyze the issue of control in terms of function in order to determine for which corporation an employee in reality works.

*Mohan v. Continental Distilling Corp.*, 422 Pa. 588, 222 A.2d 876, 879 (1966); *see also Kiehl*, 535 A.2d at 573; *Joyce v. Super Fresh Food Markets, Inc.*, 815 F.2d 943, 946 (3d Cir.1987). This so-called "functional" analysis focuses on "the functions performed by each corporation and by the employee. If the corporate functions are distinct and in the performance of his

duties, the employee is shown to have acted in furtherance of the functions of only one, or essentially one of the corporations, then that corporation will be deemed his employer." *Mohan*, 422 Pa. at 593, 222 A.2d 876. Although *Mohan* and *Kiehl* each involved a choice between a parent and a subsidiary, in *Joyce* the Third Circuit applied the functional analysis to cases where the choice was between two sibling subsidiaries, as it is in the case at bar. *Joyce*, 815 F.2d at 945 (seeing "no reason" why the analysis applied to a parent and a wholly-owned subsidiary should not apply to two wholly-owned subsidiaries).

In *Mohan* and *Kiehl*, the Pennsylvania Supreme Court found the functional analysis dispositive of the question of the employer's identity. In *Mohan*, the parent corporation produced industrial alcohol and its subsidiary produced alcohol for human consumption, and the Supreme Court considered these to be two distinct functions. *Mohan*, 422 Pa. at 591–93, 222 A.2d 876. The court further deemed the plaintiff, who was injured while sealing cases of whiskey, to have been serving the function of only the subsidiary, and reversed the trial court's denial of a motion for judgment n.o.v. *Id.* In *Kiehl*, the parent company operated several munitions plants, one of which was a wholly-owned subsidiary that produced only detonators; those injured while loading, painting and packing the detonators were deemed to be employees of the subsidiary. *Kiehl*, 535 A.2d at 574. Although the *Kiehl* court found that the employee's actions both furthered the function of the subsidiary and also "indirectly" benefitted the parent in that the detonators were produced to fulfill the parent's contractual obligations, it reversed the trial court's non-jury disposition because the employee's actions "essentially" furthered only the subsidiaries' functions. *Id.*

In *Joyce*, however, the functional analysis was not dispositive. The Third Circuit found that the injured employee's conduct could be viewed as furthering either one of the corporation's functions, and that therefore the functional analysis was "of little aid." *Joyce*, 815 F.2d at 946–47. One subsidiary's function was to supply supermarket products to another subsidiary, a retailer whose primary mission was to sell those products and others to the public. *Id.* The employee was injured while placing the supplier's products on the shelf at the retail store, conduct that the Third Circuit found arguably furthered both of the companies' functions: the employee could have been fulfilling a duty of the supplier in bringing the products to the retailer, or a duty of the retailer in setting up a display to help sell those products to the public. *Id.* Because the functional analysis was not dispositive, the *Joyce* court then turned to "other indicia" of the right to control, as instructed by *Mohan*, 222 A.2d at 879, including (1) which party had the right to hire and fire; (2) which party possessed the obligation to pay wages, (3) which party supplied the employee with the tools of her job, and (4) to which party the employee normally reported. *See Joyce*, 815 F.2d at 947. Had the facts in the record sufficiently enabled the court to identify the employer, the *Joyce* court noted, the trial court could have properly decided the matter as a question of law; however, because there were material discrepancies in the records as to these factors, the *Joyce* court reversed the lower court's grant of summary judgment. *Id.* ("[A]ny discrepancy in the facts would be for a jury to resolve; however, whether the facts as they are determined to exist constitute an employment relationship is strictly a question of law.")

In sum, because this case presents the problem of distinguishing which among affiliated entities is the employer for the

purpose of the WCA, this court must first apply the functional analysis. If the functional analysis does not reveal that the corporations have distinct functions, or does not determine that each of the employees in question was acting in furtherance of one or essentially one of the corporations, then the court will turn to the right-of-control test. If genuine issues of fact are presented as to the right-to-control, the court must leave the determination to the jury.

*III. Discussion*

■ Defendants' argument is essentially that Hart National, as the central office of the real estate conglomerate, was the only subsidiary with any employees or distinct "function"; under this theory, all of the subsidiaries and all of the parties, including the plane owner Hart Delaware and pilot Fare, acted only in furtherance of Hart National's real estate business and were thus employees of Hart National. However, the court finds that Hart Delaware clearly had a function distinct from that of Hart National in that it served as the operating company of the aircraft, and that pilot Fare was clearly an employee of Hart National. Therefore, since it is not disputed that neither Thompson nor Schalliol was an employee of Hart National, all of plaintiffs' claims survive summary judgment with respect to the WCA's exclusive remedy provision.

■ The court first notes that Pennsylvania authority "disfavor[s]" the "unitary treatment" of sibling corporations as a single employer for the purposes of workmen's compensation. *Joyce,* 815 F.2d at 945 (citing *Mohan,* 222 A.2d 876). This policy rests upon the notion that a corporation that raises the corporate veil to gain economic advantages may not simply pierce that veil whenever it poses economical disadvantages, such as in workman's compensation cases. In other words, "one cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders) detriment .... the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes whichever suits their present economic interest." *Kiehl,* 535 A.2d at 574 (citing *Sams v. Redevelopment Authority,* 431 Pa. 240, 244 A.2d 779, 781 (1968)). In this case, defendants' argument that Hart Delaware was incorporated "only" to hold title to the plane overlooks the obvious fact that such an incorporation is motivated by the legal benefits afforded by the corporate form. In fact, the officers of the corporations acknowledged as much. The Controller of all the corporations, Marie Ciampa, testified that Hart Delaware was "established on the advice of our attorneys and certified public accountants to hold title to the airplane." Ciampa Aff. at ¶ 8. The Secretary/Treasurer of all the corporations, Debra DeCarlo, also testified that the creation of Hart Delaware was "because of the tax structure ... they wanted a separate entity to own the plane." DeCarlo Dep. at 35–36. Furthermore, the liability insurance for the aircraft, its passengers and crew lists Hart Delaware as its insured. Thompson's Resp. to Mot. for Summ.J. Ex. I. On a policy basis, therefore, in following Pennsylvania law the court must disfavor piercing the veil for the purpose of the WCA in this case.

Furthermore, the facts of this case also strongly refute the argument that Hart Delaware and Hart National are the same entity for the purpose of the WCA. The record establishes that Hart Delaware did not simply exist as a static entity with no active function, as defendants claim, but rather that Hart Delaware was the corpo-

rate entity responsible for the plane's active and ongoing operations. When the airplane incurred costs, outside venders looked to Hart Delaware. *See, e.g.,* Thompson's Resp. Ex. G (airplane fuel bill); *id.* Ex. H (landing fees bill). The financial records of Hart Delaware reported operating expenses, such as hangar costs, maintenance and repair, and fuel. Ciampa Dep. Ex. 25. They also reported Fare's salary and reflected the costs Fare incurred as a pilot, such as meals, lodging, entertainment, car rental, beeper and cell phone. Ciampa Dep. 27–28, 47–48, 51; Thompson's Resp. Exs. J–K. Hart Corporation's consolidated income tax return, filed on behalf of itself and its subsidiaries, claims the salary of Fare and the costs of maintaining the airplane as deductible expenses of Hart Delaware. Thompson's Resp. Ex. E. Hart Delaware's books also reflect income representing amounts booked to the other Hart subsidiaries according to how often those subsidiaries used the plane, which equaled the amount of expenses incurred in operating the plane. Ciampa Dep. at 59–60; DeCarlo Dep. at 52–53. These facts clearly estab-

lish that Hart Delaware served not simply as title holder, but also as the corporate operating entity of the plane.[2]

In addition, Fare was not only the pilot of the plane, but he also managed the plane's maintenance, flight logs, and other day-to-day tasks necessary to keep an aircraft in service. He ensured that the plane was hangared and maintained properly, DeCarlo Dep. at 49, took the plane to whatever location he determined necessary for repairs and without reporting the itinerary, *id.* at 184–85, and kept the maintenance records and other plane logs. *Id.* at 195. Fare could authorize a fuel credit card for himself to assist with his piloting duties. *Id.* at 54. These are operational tasks uniquely associated with the operation of a plane, not with real estate.[3]

Therefore, it is clear that Hart Delaware engaged in aircraft transportation, a function distinct from that of Hart National, which engaged in the real estate brokerage business. Despite defendants' strenuous assertions to the contrary, the fact that the plane was flown only in service of the real estate brokerage business does not diminish this distinction. On this

---

**2.** Contrary to defendants' assertions, it is of no import that the entries concerning the plane's operating expenses, including the pilot's salary and the plane's fuel, maintenance, insurance costs, were "purely bookkeeping entries" for "accounting and tax purposes only" and that all actual payments were made by Hart National. Ciampa Aff. at ¶ 7; *see also id.* at ¶¶ 5–9 (all revenues were deposited in the Hart National checking account and all expenses were paid by Hart National; other subsidiaries had only escrow or trust accounts as required for state licensing purposes). In *Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655, 657 (6th Cir.1979), the parent company entered into sales contracts based on the coal produced from the mines of its wholly-owned subsidiaries. The sale from a particular mine would be entered as a credit on the books of the subsidiary owning that mine; however, all the money was retained by the parent, who paid the subsidiary's ex-

penses as reflected in the intercompany books. *Id.* The fact that corporate finances were separate on paper, but not in reality, did not preclude the Sixth Circuit from holding that the parent and the subsidiary were separate entities for the purpose of the exclusive remedy provision of the Kentucky workmen's compensation act. *Id.* at 662–63.

**3.** Furthermore, to the extent that Hart, Ciampa and DeCarlo had any control over the actual day-to-day operational duties associated with the plane, they served both Hart National and Hart Delaware as chief officer, Controller and Secretary/Treasurer, respectively. Thus, even if defendants' argument that the planes' operations were managed by Hart, Ciampa or DeCarlo was supported by the record, it would not assist them in establishing that Hart National and not Hart Delaware was the operator of the plane.

point, *Kiehl* is particularly instructive. In *Kiehl*, the parent company owned five munitions-manufacturing plants. *Kiehl*, 535 A.2d at 572. The plaintiff employees were injured at the plant of a wholly-owned subsidiary, which produced a specific type of munitions known as load detonators that the other plants could not produce because of federal safety restrictions. *Id.* The detonator plant had its own manager for day-to-day operational duties; however, the parent controlled all major policy decisions relating to production, purchases and sales at the detonator plant, which itself had "no customers of its own, no individual sales division, and no independent contracts." *Id.* Therefore, the purpose of the subsidiary—the production of load detonators—was wholly to serve the business needs of its parent company, as determined solely by the parents' obligations to provide detonators to its clients. *See id.* at 574. Yet the Pennsylvania Supreme Court refused to consider the subsidiary as functionally subsumed by the parent, analogizing its holding to that of *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946), which observed the corporate separateness of a subsidiary and parent for the purpose of a transportation permit where the subsidiary was engaged solely in transporting goods for the parent. *Kiehl*, 535 A.2d at

575. The same principles apply in this case. Hart Delaware's plane operations may have been wholly devoted to fulfilling the air transportation needs of the real estate business; however, the plane operations are clearly distinct, for the purpose of workmen's compensation, from the real estate operations.

■ Having determined that Hart Delaware served a function distinct from that of Hart National, the court must now assess whether pilot Fare was essentially serving either Hart National or Hart Delaware at the time of the crash. *Kiehl* is again instructive, in that it found that employees unloading, painting and packing detonators at the plant were employees of the subsidiary and not of the parent, even though the detonators had been produced specifically to meet the business obligations of the parent. *See id.* at 574. The "indirect" benefit to the parent munitions company did not overcome the fact that the employees "essentially" furthered the functions of the detonator-producing subsidiary. *See id.* Similarly, in this case, the piloting of the plane was a function the plane-flying functions of Hart Delaware, while it only indirectly benefitted the real estate brokerage business of Hart National.[4],[5]

---

4. This is simply not a case where the duties in question could conceivably be viewed as a function of either corporation, as in *Joyce*. In *Joyce*, the act of unloading supermarket products onto the retailer's shelves was arguably the function of either the supplier or the retailer. *Joyce*, 815 F.2d at 946–47. In essence, the ambiguity arose from the fact that the two companies were involved in a chain of commerce, and where one link of the metaphorical chain ended and the other began were unclear. No such overlapping functions exist in this case. As Kiehl makes clear, the fact that the sole function of a subsidiary is to service the parent's business needs does not collapse the companies' functions for the purpose of the workmen's compensation act.

5. Alternatively, the defendants argue that even if Fare was regularly employed by Hart Delaware, at the time of the accident he was in fact an employee of Hart National under the borrowed servant's doctrine. The borrowed servant's doctrine is often applied when determining whether a temporary employment agency is the employer, or whether the company at which the agency places the worker is the employer. *See English v. Lehigh County Authority*, 286 Pa.Super. 312, 428 A.2d 1343, 1349 (1981); *JFC Temps, Inc., v. Workmen's Compensation Appeal Board*, 545 Pa. 149, 680 A.2d 862 (1996). The borrowed servant's doctrine applies the same criteria as the right-to-control test. *Joyce*, 815 F.2d at 946. However, in cases where two

## IV. *Conclusion*

Because the functional analysis clearly establishes that Fare was an employee of Hart Delaware and not of Hart National, it is unnecessary to analyze other indicia of the right-to-control. It is also unnecessary to inquire as to the employer of Thompson, because Thompson's claims against Fare and Hart Delaware survive the instant motion for summary judgment regardless of whether Thompson's employer was Hart Southeast or Hart National. For the foregoing reasons, summary judgment is denied.

An appropriate Order follows.

### ORDER

**AND NOW,** this 21st day of November, 2001, upon consideration of the Summary Judgment Motion of Defendants John Fare, Jr., as Personal Representative of the Estate of John Joseph Fare, Deceased, and Hart Corporation/National Division, the response of plaintiff Lee Ann Thompson thereto, the response of plaintiff Mary Schalliol thereto, the reply, and after a hearing, it is hereby **ORDERED** that the motion is **DENIED.**

affiliated corporations are involved, the borrowed servant's doctrine, like the right-to-

control test, is only applied where the functional analysis is not dispositive. *Id.*