352 F.Supp.2d 533 (2004)
In re: DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION
Kathy Meunier
v.
Wyeth, et al.
No. 1203, CIV.A. 03-20548.
United States District Court, E.D. Pennsylvania.
December 1, 2004.
*534 *535 Brian S. Katz, Paducah, KY, for Plaintiff.
Richard H.C. Clay, Tera M. Rehmel, Woodward, Hobson & Fulton, Louisville, KY, E. Frederick Straub, Jr., Whitlow, Roberts, Houston & Straub, Paducah, KY, for Defendants.

MEMORANDUM AND PRETRIAL ORDER NO.
BARTLE, District Judge.
Before the court is the motion of plaintiff Kathy Meunier to remand her claims against defendants Wyeth[1] and Robert Bichon, D.O. ("Dr.Bichon") to the Circuit *536 Court of McCracken County, Kentucky on the ground that complete diversity of citizenship is lacking. See 28 U.S.C. § 1332. The motion to remand is before the undersigned as transferee judge in MDL 1203, the mass tort litigation involving Wyeth's diet drugs Pondimin and Redux.

I.
Plaintiff, a citizen of Kentucky, has sued Wyeth, the manufacturer of Pondimin and Redux, as well as Dr. Bichon, the physician who allegedly prescribed Pondimin for her. Wyeth is of diverse citizenship from plaintiff while Dr. Bichon is not. Plaintiff asserts claims for negligence and negligence per se, strict liability (defective design and failure to warn), fraud and fraudulent concealment against defendants. No federal claim for relief is alleged.
Plaintiff has exercised her right of intermediate opt-out under the Nationwide Class Action Settlement Agreement ("Settlement Agreement") in Brown v. American Home Products Corporation, CIV.A. No. 99-20593 (E.D.Pa. Aug. 28, 2000) (Pretrial Order ("PTO") No. 1415), which encompassed the claims of persons who ingested Wyeth's diet drugs Pondimin and Redux. See e.g., Settlement Agreement at § IV(A), (B), and (D)(4). Under the Settlement Agreement, those who have exercised an intermediate or back-end opt-out may sue Wyeth for compensatory but not punitive damages in the tort system rather than obtain benefits from the AHP Settlement Trust. See Settlement Agreement § IV.D.3.c. In return for the prohibition against punitive damages, Wyeth has waived the statute of limitations. See Settlement Agreement § IV.D.3.c.
The complaint was originally filed in the Circuit Court of McCracken County, Kentucky on April 17, 2003, more than five years after Pondimin and Redux were withdrawn from the market in September, 1997. Wyeth timely removed the action to the United States District Court for the Western District of Kentucky on the ground that plaintiff has fraudulently joined Dr. Bichon and that his citizenship should be disregarded for the purposes of determining diversity jurisdiction. The action was then transferred to this court as part of MDL 1203.

II.
Under the removal statute, "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court...." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions between citizens of different states if the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a). Complete diversity, however, is required. See Caterpillar Inc. v. Lewis, 519 U.S. 61, 68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996); Strawbridge v. Curtiss, 3 Cranch 267, 7 U.S. 267, 2 L.Ed. 435 (1806). If an action originally filed in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court if they are not citizens of the state in which the action was originally filed. 28 U.S.C. §§ 1441(a) & (b), 1446. If a federal court subsequently determines that it does not have subject matter jurisdiction over a removed action or the proper removal procedures were not followed, it must remand the action to the state court. See 28 U.S.C. § 1447(c); Balazik, 44 F.3d at 213.
Wyeth bears a heavy burden in seeking to have the court ignore the citizenship of the non-diverse defendant, Dr. Bichon, on the ground that he was fraudulently joined. See Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir.1990). In *537 determining whether Wyeth has met its burden, the court must "resolve all contested issues of substantive fact in favor of the plaintiff." Id. We are also cognizant of the fact that the removal statute must be construed narrowly, and "all doubts should be resolved in favor of remand." Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir.1987) (citation omitted). The heavy burden placed upon Wyeth to establish fraudulent joinder does not mean we must accept blindly whatever plaintiff may assert no matter how incredible or how contrary to the overwhelming weight of the evidence. The Supreme Court made it clear in Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921), that if a plaintiff contests a defendant's assertion that joinder of another defendant was a sham to defeat removal, the District Court must determine the facts from the evidence. Wilson, 257 U.S. at 98, 42 S.Ct. 35. We are not to decide automatically in favor of remand simply because some facts may be in dispute.
As an MDL court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard. See In re Korean Air Lines Disaster, 829 F.2d 1171, 1174 (D.C.Cir.1987); In re Ikon Office Solutions, Inc., 86 F.Supp.2d 481, 485 (E.D.Pa.2000). This court must decide whether there is "a reasonable basis in fact or colorable ground supporting the claim against the joined defendant." Boyer, 913 F.2d at 111.
On matters of substantive law, "[i]f there is even a possibility that a state court would find that a plaintiff's complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." Boyer, 913 F.2d at 111 (citation omitted). We are mindful that our inquiry into Wyeth's claim of fraudulent joinder is less searching than what is permissible when a party seeks to dismiss a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Batoff v. State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir.1992); see also, Gaul v. Neurocare Diagnostic, Inc., No. 02-CV-2135, 2003 WL 230800, at *2 (E.D.Pa. Jan.3, 2003). Simply because a claim against a party may ultimately be dismissed for failure to state a claim or is otherwise barred does not necessarily mean that the party was fraudulently joined. The test is whether a claim is colorable, that is, not "wholly insubstantial and frivolous." Batoff, 977 F.2d at 852.

III.
Wyeth argues that plaintiff's complaint against Dr. Bichon is clearly barred by the Kentucky statute of limitations, which provides that "[t]he following actions shall be commenced within one (1) year after the cause of action accrued: ... an action against a physician, surgeon, dentist, or hospital ... for negligence or malpractice." KY. REV. STAT. ANN. § 413.140(1)(e). This statute "governs all causes of action against physicians and surgeons regardless of whether the claim be alleged in tort or in contract." Hackworth v. Hart, 474 S.W.2d 377, 380 (Ky.1971) (citations omitted). The limitations period begins to run when "the injury is first discovered or in the exercise of reasonable care should have been discovered." KY. REV. STAT. ANN. § 413.140(2). The Kentucky Supreme Court has found that the statute is triggered when the plaintiff knows: "(1) he [or she] has been wronged; and (2) by whom the wrong has been committed." Wiseman v. Alliant Hosp., Inc., 37 S.W.3d 709, 712 (Ky.2000) (citations omitted). Moreover, "[i]t is the date of the actual or constructive knowledge of the injury which triggers the running of the statute of limitations." Id.
*538 Pondimin was pulled from the market on September 15, 1997. That was the last day Dr. Bichon could have prescribed this drug for plaintiff. The last time he examined plaintiff was November 19, 1997. See Bichon Answer at ¶ 1. Plaintiff did not file her claim in the Kentucky state court until April, 2003, over five years after her last contact with Dr. Bichon and clearly beyond the applicable one-year statute of limitations. See KY. REV. STAT. ANN. § 413.140(1)(e).

IV.
Plaintiff asserts that her complaint is not time-barred under Kentucky's discovery rule because she could not have discovered that Pondimin caused her injury until the results of her echocardiogram revealed her alleged heart problem. See KY. REV. STAT. ANN. § 413.140(2). Plaintiff contends that her echocardiogram was performed less than a year before her action was instituted. Plaintiff also claims that her diagnosis occurred less than a year prior to filing her complaint.
Wyeth responds that plaintiff's deposition testimony indicates that she was aware of her potential claims by at least September, 2001, over a year and a half before filing suit in April, 2003. In September, 2001, plaintiff retained the law firm of Fleming and Associates which began collecting medical records in preparation for the instant suit. In her deposition, plaintiff states that in September, 2001, she "knew she had some kind of problem," and that she thought "it might be related to diet drugs." Meunier Dep. at 252-53.
Wyeth also submits that plaintiff should have been on notice of her stated injuries as a result of the widespread publicity accompanying the withdrawal of the diet drugs from the market in September, 1997. Wyeth contends that plaintiff should have known about her alleged injuries at the very latest by the end of March, 2000, at the height of Wyeth's extensive publicity campaign.
The publicity began on September 15, 1997, with national news coverage of the withdrawal of Wyeth's diet drugs. Reports about the withdrawal were the leading stories on major television network news programs, including NBC Nightly News, CBS Evening News and the Today Show. USA Today, a daily newspaper with a national readership, ran a front-page story regarding the withdrawal of diet drugs, its effects, and the response by various organizations throughout the United States regarding the news. The article went so far as to report that potential litigation was imminent and people who had taken diet drugs were signing up with attorneys to take part in a large class action lawsuit.
In addition, Wyeth informed consumers about the recall of its diet drugs. Immediately after removing the drugs from the market on September 15, 1997, Wyeth issued a press release advising patients who had used diet drugs to consult their physicians. It included the same message in full-page ads that it purchased in leading national and regional newspapers. These ads led with a banner in large print, stating "An Important Message To Patients Who Have Used Pondimin or Redux." Furthermore, Wyeth sent a "Dear Health Care Provider Letter" to approximately 450,000 physicians and pharmacists in which it informed them of the withdrawal of the drugs from the market and of the potential association between use of the drugs and instances of valvular heart disease.
Even if the plaintiff was somehow not apprised of her potential claims as a result of this extensive publicity, she certainly was put on notice by the end of March, 2000, with the comprehensive publicity campaign surrounding the nationwide class *539 action Settlement Agreement with Wyeth. See PTO No. 997 at 7 (E.D.Pa. Nov. 23, 1999).[2] The notice program "employed sophisticated media techniques and was designed to reach all class members" to make them "aware of the potential risks posed by Pondimin and Redux." PTO No. 1415 at 79-80. This court described the exhaustive and far-reaching nature of the notice campaign in PTO No. 1415:
A television commercial was developed ... [which] broadcast 106 times over a period of five weeks on network television. The television commercial message was also broadcast 781 times, for six consecutive weeks on various cable networks.
A summary notice was prepared for use in the print media. The summary notice appeared repeatedly in several magazines between January and March 2000. The summary notice appeared as a one-third page black and white ad in four national newspapers, 77 local newspapers, 3 newspapers distributed throughout the U.S. Territories and four newspapers targeted to the Hispanic market. These newspapers were selected because they were national publications, or because they represented the principal newspapers in the top 15 markets in the United States, or because they were published in geographic areas having the highest usage of Pondimin and Redux, and/or because they were targeted to African-American or Spanish speaking populations. In addition, the summary form of notice was published in a variety of publications targeted to healthcare providers and pharmacists. Banner ads were also developed for use on the Internet, directing potential class members to the official settlement website where class members could receive information concerning the settlement and obtain a notice package. These banner advertisements were placed within several media categories on a variety of Internet publishers.
In addition to the above, notice was transmitted by mail to all pharmacists in the United States and to doctors who were likely to have prescribed Pondimin or Redux or treated patients for complications resulting from the use of those drugs. Notices to these healthcare providers contained a "notice package," a letter of explanation and a counter card reflecting the summary form of notice described above, which pharmacists and physicians could display to alert patients about the existence of the settlement and the opportunity to obtain a "notice package" by contacting the 1-800 number or official web site.... Such mailings were transmitted to 784,128 physicians and to 108,288 pharmacists.
Id. at 80-82 (citations and footnotes omitted).
The court also explained that the summary notice appeared ten times between January and February, 2000 in the form of a full-page black and white advertisement in Parade, People, and Time magazines. A full-page black and white version of the summary notice was inserted into eight monthly magazines during February, 2000, including Better Homes & Gardens, Ladies Home Journal, Family Circle, McCalls, Women's Day, Redbook, Good Housekeeping and Ebony. Additional insertions of the summary notice appeared as full-page black and white ads in the March editions of Better Homes & Gardens and Good Housekeeping. Finally, a two-page black and white version of the summary notice was placed in Reader's Digest during February and March, 2000.
This court found that the media program concerning the proposed settlement *540 was "highly successful" at reaching targeted women. PTO No. 1415 at 83. It explained:
97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of 10 times. A reach and frequency analysis indicated that almost 80% of women between the ages of 25 and 54 were exposed to the messages contained in televised or printed forms of notice a minimum of five times.... In addition, a reach and frequency analysis indicated that the settlement message reached 97% of women 35 years and older an average of 11.4 times and that it reached 81% of women 35 years and older a minimum of five times. With respect to African-American women between the ages of 25 and 54, the reach and frequency analysis shows that the settlement message reached 97% of those women an average of 10.2 times and that 79% of African-American women between the ages of 25 and 54 viewed the message a minimum of five times.
Id. at 83 n. 16 (citations omitted).
Media coverage of the withdrawal of the diet drugs was not limited to national markets but also penetrated plaintiff's hometown of Paducah, Kentucky. In the Fall of 1999 and into 2000, the local media surrounding Paducah were inundated with news of the lawsuits related to the diet drugs. Both the Paducah Sun and Harrisburg Daily Register covered trials, jury verdicts, and settlements rendered throughout the nation in the diet drug litigation. See, e.g., Associated Press, "Attorney: Company hid diet drug risk," Paducah Sun, Aug. 5, 1999; Associated Press, "Fen-phen case settled for $23.3 M," Daily Register, Sept. 17, 1999, attached as Exs. 32, 33 to Wyeth's removal notice. The local papers for Paducah, Kentucky also covered both the negotiations and approval of the Settlement Agreement. See, e.g., Amy Westfeldt, "Diet drug settlement in danger if fen-phen users reject deal," Paducah Sun, Oct. 15, 1999, attached as Ex. 40 to Wyeth's removal notice.
The local coverage of the Settlement Agreement included a two-part series on mass litigation involving the diet drugs that ran on the front page of the Paducah Sun in December, 1999. The first article ran in a Sunday edition and announced: "On Sept. 15, 1997, the U.S. Food and Drug Administration made a jolting announcement: it asked the makers of two popular diet pills used by millions of overweight Americans to pull the drugs from the market." See L. Stuart Ditzen, "Anatomy of a monster: how mass litigation suits come to pass," Paducah Sun, Dec. 19, 1999, attached as Ex. 45 to Wyeth's removal notice. Both articles in this two-part series described the allegations that the diet pills "might cause heart valve damage." Id.
Plaintiff contends that the extensive publicity surrounding the diet drugs was ambiguous and created an unreviewable question of fact beyond the purview of this court. She attaches as an exhibit to her motion to remand several news articles indicating that the diet drugs might not cause heart problems. See, e.g., Steve Sternberg, "Study: No heart damage from diet drug," USA Today, Apr. 1, 1998, attached as Ex. 4 to Pl.'s Remand Motion. Although these articles may provide contradictory information about the alleged effects of the diet drugs, they also discuss the purportedly harmful effects of the diet drugs and remind diet drug users to see their doctors or be checked for heart problems. See, e.g., Steve Sternberg, "Diet drugs' impact on heart still hazy," USA Today, Nov. 12, 1998, attached as Ex. 4 to Pl.'s Remand Motion.
Under Kentucky law, knowledge of an injury sufficient to trigger the statute *541 of limitations consists "not only of what one certainly knows, but also of information which [s]he might have obtained by an investigation of facts which [s]he does know and which impose upon [her] the duty to make that investigation." Peoples Gas Co. of Ky. v. Fitzgerald, 188 F.2d 198, 200 (6th Cir.1951). We agree with Wyeth that even with allegedly contradictory information surrounding the withdrawal of the diet drugs, the total universe of information available would have caused a reasonable person to investigate her potential claims. A plaintiff in Kentucky who fails to make any inquiry or take any action in the face of extensive media coverage fails "to exercise reasonable diligence as a matter of law." Blanton v. Cooper Indus., Inc., 99 F.Supp.2d 797, 803 (E.D.Ky.2000).
Plaintiff contends that she could not have reasonably discovered her injury before April, 2002 because her injury was latent and did not manifest itself until that time. As noted above, plaintiff's sworn deposition testimony contradicts this contention. Ignoring this testimony, plaintiff supports her latency argument by pointing to Wyeth documents which state that "symptoms reportedly developed as late as 6 years following discontinuation of [Pondimin] use." However, those documents do not relate to valvular heart injuries but rather to pulmonary hypertension, an injury that plaintiff does not allege. Our then colleague Judge Louis C. Bechtle,[3] in PTO No. 1415, determined after a lengthy fairness hearing that Pondimin and Redux did not cause latent heart valve injuries but that the injury occurred at or near the time of last use. In the August 28, 2000 Order approving the Settlement Agreement, Judge Bechtle stated: "[t]he absence of a latency period between the ingestion of [the diet drug] and the development of clinically detectable [heart disease] is ... confirmed by a number of studies ..., [each of which finds] that there was no emergence of new disease after some latency period." PTO No. 1415 at 46.
The plaintiff here is a class member and as such was a party to the Settlement Agreement. The issue of latency was actually litigated in the fairness hearing and is one of the same issues that the plaintiff is now raising in an attempt to defeat the bar of the statute of limitations. Judge Bechtle's determination of no latency, that is, that the class members' injuries occurred within a short time after ingesting fen-phen, was an essential finding, for it directly affected the adequacy of class representation. See PTO No. 1415 at 104-08. Memorandum and PTO No. 1415, in which Judge Bechtle approved the Settlement Agreement, is a final and valid judgment, upheld on appeal. Thus, plaintiff is collaterally estopped from re-litigating the issue of latency.
In short, due to the widespread publicity surrounding the withdrawal of the diet drugs, plaintiff should have known about her alleged injuries at the very latest by the end of March, 2000. Thus, there is "no reasonable basis in fact" that plaintiff can rely on the discovery rule to toll the statute of limitations for her claims against Dr. Bichon beyond that point in time. See Boyer, 913 F.2d at 111.

V.
Even if plaintiff did not sue within the one-year Kentucky statute of limitations and cannot benefit from the discovery rule, she argues that the statute of limitations is tolled because of the open courts doctrine. Thus, plaintiff asserts, Dr. Bichon's joinder as a proper defendant *542 in this action defeats diversity and thereby requires this court to remand the action to state court.
The open courts provisions of the Kentucky Constitution "prohibit the abolition or diminution of legal remedies for personal injuries and wrongful death." McCollum v. Sisters of Charity of Nazareth Health Corp., 799 S.W.2d 15, 18 (Ky.1990). Section 14 of the Kentucky Constitution provides: "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." KY. CONST. § 14. Section 54 states: "The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property." KY. CONST. § 54. In McCollum, the Kentucky Supreme Court found unconstitutional the five-year statute of repose which prevents a plaintiff from commencing a medical malpractice action more than five years after the date on which the alleged negligent act was inflicted. 799 S.W.2d at 18 (citing KY. REV. STAT. ANN. § 413.140(2)). Unlike the Kentucky one-year statute of limitations for medical malpractice, which limits the time in which a plaintiff may bring suit after a cause of action accrues, the Kentucky statute of repose potentially bars the plaintiff's suit before the cause of action arises. McCollum, 799 S.W.2d at 18. The court found that the five-year statute of repose conflicts with the open courts provisions because it would be possible for a claim to accrue more than five years after the alleged negligent act was inflicted. Id. at 19 (citing KY. REV. STAT. ANN. §§ 413.140(1)(e), (2)). However, the McCollum court also recognized that the open courts provisions did not toll the statute of limitations when the "fact of injury is known." Id. at 19.
Here, as in McCollum, plaintiff cannot rely on the open courts doctrine to toll the statute of limitations under the Kentucky law. See KY. REV. STAT. ANN. § 413.140(1)(e). In light of the excessive publicity surrounding the withdrawal of the diet drugs, plaintiff, through the exercise of reasonable diligence, should have discovered her alleged injuries by the end of March, 2000, at the latest. Because she knew of, or through the exercise of reasonable diligence should have discovered her purported injuries, her action accrued by that time. Thus, plaintiff cannot rely on the open courts doctrine to toll the statute of limitations for her claims against Dr. Bichon.

VI.
Plaintiff also maintains that the statute of limitations is tolled as to Dr. Bichon because he has fraudulently concealed facts which would alert plaintiff about the dangers associated with the use of diet drugs. While Wyeth has the burden of establishing fraudulent joinder, plaintiff has the burden of proving fraudulent concealment. U.S. ex rel. Tillson v. Lockheed Martin Energy Systems, Inc., 2004 WL 2403114, at *22 (W.D.Ky. Sept.30, 2004). Section 413.190(2) of the Kentucky Revised Annotated Statutes tolls the running of the statute of limitations where a defendant "obstructs the prosecution of the action." See Munday v. Mayfair Diagnostic Lab., 831 S.W.2d 912, 914 (Ky.1992). Under the fraudulent concealment savings provision, a plaintiff must prove an affirmative act of concealment. Id.; Roman Catholic Diocese of Covington v. Secter, 966 S.W.2d 286, 290 (Ky.App.1998). In addition, allegations of fraudulent concealment must be pleaded with particularity. Lanier v. Kingeren, 201 F.3d 441, 1999 WL 1253089, at *1 (6th Cir. Dec.17, 1999) (citations omitted).
*543 Plaintiff, in her complaint, alleges that Dr. Bichon's "concealment of the dangers associated with the diet drug Pondimin and his failure to advise Ms. Meunier of the necessity of undergoing a cardiovascular exam and echocardiogram ... constitute fraud." Compl. at ¶ 71. She also claims that Dr. Bichon was aware of the dangers associated with the diet drugs or "as a medical practitioner, a doctor prescribing Pondimin, and a fiduciary to Plaintiff, was under a duty to become aware of this information." Compl. at ¶ 71. However, plaintiff fails to allege that there has been active concealment on the part of Dr. Bichon. Under such circumstances, plaintiff can only prevail on her claim of fraudulent concealment if there was a duty on the part of Dr. Bichon to disclose information that plaintiff could not have discovered through the exercise of reasonable diligence. See Diocese of Covington, 966 S.W.2d at 290.
Plaintiff appears to argue that a fiduciary relationship "exists" between her and Dr. Bichon. Thus, plaintiff maintains, "Dr. Bichon should be estopped from asserting the affirmative defense of limitations." Compl. at ¶¶ 71, 74. We are not persuaded. Plaintiff contends that Dr. Bichon "was" her physician. Compl. at ¶ 4. The last time Dr. Bichon treated plaintiff was November 19, 1997. See Bichon Answer ¶ 1. The Supreme Court of Kentucky has opined that an ongoing relationship between a physician and patient is a fiduciary one, which "grants a patient the right to rely on the physician's knowledge and skill." Wiseman, 37 S.W.3d at 713. Plaintiff clearly does not have an ongoing relationship with Dr. Bichon. Because plaintiff's complaint was filed over five years after her last contact with him, the limitations period has elapsed. Again, there is "no reasonable basis in fact or colorable ground" supporting plaintiff's reliance on her fiduciary relationship to Dr. Bichon to justify her untimely delay in filing her complaint against him. Boyer, 913 F.2d at 111.
In short, plaintiff's attempt to allege fraudulent concealment falls short of what is required under federal or Kentucky law. See Fed.R.Civ.P. 9(b); Ky. R. Civ. P. 9.02. Moreover, even if fraudulent concealment were applicable, plaintiff would still have a "duty to exercise reasonable care and diligence to discover whether [s]he has a viable legal claim." Hazel v. General Motors Corp., 863 F.Supp. 435, 439 (W.D.Ky.1994) (citations omitted); Burke v. Blair, 349 S.W.2d 836, 836 (Ky.1961). As noted above, in light of the excessive publicity surrounding the withdrawal of the diet drugs, plaintiff failed to exercise reasonable diligence in waiting over three years after the height of the media blitz to bring her claim against Dr. Bichon. Thus, there is "no reasonable basis in fact or colorable ground" that plaintiff can invoke the fraudulent concealment saving provision to toll the statute of limitations. Boyer, 913 F.2d at 111.

VII.
Finally, plaintiff maintains that certain provisions of the Settlement Agreement prevented her from bringing her claim within the limitations period. She argues that she could not have instituted her suit against Dr. Bichon because the Settlement Agreement imposed a stay which lasted from August 28, 2000 until January 3, 2002, and prohibited plaintiff from prosecuting her action. We disagree. Nothing in the Settlement Agreement or PTO No. 1415 prevented plaintiff from obtaining an echocardiogram and filing suit before final judicial approval of the Settlement Agreement.
Plaintiff further asserts that the Settlement Agreement and Memorandum and PTO No. 1415 enjoined her from initiating an action against Wyeth and Dr. Bichon *544 until the date of the qualifying echocardiogram. Plaintiff is correct that she could not opt out of the Settlement Agreement until she had a qualifying echocardiogram. Settlement Agreement § IV.D.3. However, the Settlement Agreement does not stop the operation of the state statute of limitations until a plaintiff decides to obtain a qualifying echocardiogram. Here, plaintiff did not do so until April, 2002. There was nothing that stopped her from undergoing an echocardiogram within one year of March, 2000, the latest date by which she should have reasonably discovered her alleged injuries.
In Memorandum and PTO No. 3391 at 7-9, in Amiker v. Wyeth, et al., CIV.A. No. 03-20343 (E.D.Pa. Apr. 2, 2004), we found that any non-AHP released party retains the benefit of the statute of limitations provided that the party has not affirmatively waived the benefit in writing. See PTO No. 3391 at *7-9 (citing Settlement Agreement § IV.D.3.c). Like the physician defendants in Amiker, Dr. Bichon is clearly a non-AHP released party. See Settlement Agreement § I.48.e. Plaintiff fails to contend or provide information that Dr. Bichon has agreed in writing to waive the statute of limitations. As such, he retains the benefit of the statute of limitations defense.
Finally, plaintiff contends that even if the stay prohibiting suit against Dr. Bichon were ineffective to toll the limitations period, an action against him would still have been impossible because the suit against Wyeth was stayed, and Wyeth is a necessary party to any action against a physician defendant. This argument is without merit. Even if Wyeth is a necessary party to plaintiff's claim against Dr. Bichon, nothing in the Settlement Agreement prevents plaintiff, an intermediate opt-out, from pursuing separate claims against a physician. In this action, she failed to do so before the statute of limitations had expired. Accordingly, there is no "reasonable basis in fact or colorable ground" that the Settlement Agreement allows her action against Dr. Bichon. Boyer, 913 F.2d at 111.

VIII.
We will deny the motion of the plaintiff to remand this action to the Circuit Court of McCracken County, Kentucky and will dismiss the complaint as to Dr. Bichon.

PRETRIAL ORDER NO.___________
AND NOW, this day of December, 2004, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:
(1) the motion of plaintiff to remand to the Circuit Court of McCracken County, Kentucky is DENIED;
(2) all claims against defendant Robert Bichon, D.O. are DISMISSED; and
(3) the motion of defendant Robert Bichon, D.O. for summary judgment (Doc. # 7) is DENIED as moot.
NOTES
[1] Wyeth was previously known as American Home Products Corporation.
[2] See also PTO No. 1415 at 62-66 (E.D.Pa. Aug. 28, 2000).
[3] Judge Bechtle was the original MDL 1203 judge who presided over the class action settlement in Brown. He retired on June 30, 2001.